[Filed February 1, 1892.]

## LEE GOODMAN *v.* O. R. & N. CO.

EVIDENCE — OFFER OF WRITING IN TESTIMONY.—Where it does not appear that a writing has been altered by some unauthorized person, a party offering it in evidence will not be permitted to select that part of it favorable to his case and exclude another part which might operate unfavorably.

CARRIERS — INHERENT DEFECTS OF GOODS.—In the absence of negligence on their part, carriers are not liable for losses arising from the inherent qualities of the goods they transport, or from their ordinary wear and tear in the course of carriage, or from the insecure or imperfect manner in which they are packed by the owner.

Multnomah county: E. D. SHATTUCK, Judge.

Defendant appeals. Reversed.

This action is founded upon two counts for damages to two lots of goods alleged to have been shipped over the defendant's line, one lot marked "S. W. Miller," and another lot marked "H. D.," the value of the S. W. Miller lot being charged at one thousand four hundred and eight dollars and twenty-nine cents, and that of the H. D. lot as of the

value of two thousand one hundred and twenty-five dollars and twenty-eight cents, the value being the alleged value at Portland, Oregon. The goods consisted of a variety of drugs and medicines, principally in bottles, some in barrels, consisting of oils, whiskies, etc.

It was charged in the complaint that in August, 1888, plaintiff delivered to the defendant company as a carrier at Huntington, Oregon, this merchandise, which it was charged the defendant received at Huntington, and agreed to safely transport to Portland, Oregon, and there deliver to the plaintiff within a reasonable time. The complaint then charged that the defendant did not safely carry or deliver the goods, but on the contrary, by negligence and misconduct of the defendant, "the same were in great part wholly lost and destroyed, and in great part so destroyed, damaged, and injured as to be wholly worthless and of no value, and as to the rest and remainder of the same so damaged and injured as to be rendered nearly worthless, and plaintiff was compelled to and did sell the rest and remainder for the sum of three hundred and eighty-seven dollars and seventy cents, which was and is a reasonable value therefor on account of the said damage and injury, and that all of said merchandise marked S. W. Miller was lost or so destroyed, damaged and injured as to be nearly worthless and of no value, when the same arrived in Portland, Oregon, and on account of the worthlessness of the same, plaintiff refused to receive the S. W. Miller goods on arrival at Portland, Oregon." The material allegations of the complaint were denied by the answer.

The evidence at the trial tended to show that in July, 1888, the plaintiff shipped from Kahoka, Missouri, over the Keokuk & Western Railway, two separate lots of goods by separate shipments and with separate bills of lading therefor, of the general nature and character of goods in the complaint mentioned; one lot being billed to Hugh Doak at Granger, Wyoming, for delivery there, and

another lot billed to S. W. Miller at Ogden, Utah, for delivery there. The evidence tended to prove that the goods were carried by rail by different railway companies from Kahoka, Missouri, and finally reached their respective destinations at Granger and Ogden, respectively; that in the course of this carriage, they were carried from Kansas City, Missouri, to destination by the Union Pacific Railway Company. The evidence of the plaintiff further tended to show that he followed the goods and saw them boxed in the warehouses at Ogden and at Granger, Wyoming.

The bills of lading, which he received from the Keokuk & Western Railway Company, were as follows: "Received from Dr. Lee Goodman the following described packages, in apparent good order, contents and value unknown, consigned as marked and numbered on the margin, to be transported over the line of this road (the Keokuk & Western Railroad) to the company's freight station at its terminus, and delivered in like good order to the consignee or owner at said station, or to such company or carriers, if the same were to be forwarded beyond said station, whose line may be considered a part of the road, to the place of destination of said goods or packages; it being distinctly understood that the responsibility of this company as a common carrier shall cease at the station where delivered to such person or carrier; provided no carrier or company forming a part of the line over which such freight is to be transported will be responsible for demurrage or detention at its terminus or beyond on any part of the line arising from any accumulation or over-pressure of business, upon the following conditions: Freight carried by this company must be removed from the station during business hours upon the day of its arrival, or it will be stored at the owner's risk and expense. In the event of its destruction or damage from any cause while in the depot of the company, it is agreed that the company shall not be liable to pay any damages therefor. It is agreed, and is a part of the con-

sideration of this contract, that the company will not be responsible for the leakage of liquids, breakage of glass or queensware, . * * * nor for damages arising to any article carried, from the effects of heat or cold. The company will not be responsible for damages on tobacco unless it is proved to have occurred during the time of its transit over this road; and of this, notice must be given within thirty hours after the arrival of the same. The responsibility of this company as a carrier to terminate on the delivery of freight as per this bill of lading to the company whose line may be considered as a part of the route to the place of destination of said goods or packages. In the event of the loss of any property for which the carriers may be responsible under this bill of lading, the value or cost of the same at the time and point of destination is to govern in the settlement for the same." Then followed a description of the goods and packages embraced in. the bills of lading, one lot being marked as destined to Granger, Wyoming, to Hugh Doak as consignee, and the other lot being marked as destined to Ogden, Utah, for delivery to S. W. Miller, as consignee.

The evidence tended to show likewise that after the arrival of these several lots of goods at Granger and Ogden, they were forwarded to Portland, Oregon, by the direction of the consignor, Goodman, the Granger shipment being carried over the Oregon Short Line road to Huntington; the Miller shipment over the Utah & Northern road from Ogden to Pocatello, and thence over the Short Line road to Huntington. At Huntington both lots were received and carried in the ordinary course of business over the defendant's line of road from Huntington to Portland.

There was no evidence whatever tending to prove the condition of the goods when they arrived at Huntington. The goods were shipped from Wyoming, without any bills of lading issued therefor. On the back of the bills of

XXII OR.— 2.

lading issued by the Keokuk & Western road at Kahoka,
Missouri, the following endorsement appeared: " Please
have the goods covered by this bill of lading forwarded to
Portland," signed H. Doak and Dr. Lee Goodman as to the
Granger shipment, and signed S. W. Miller and Dr. Lee
Goodman as to the Ogden shipment. The evidence tended
to show that the plaintiff had signed all these names. The
plaintiff admitted having given directions to the station
agents at Granger and Ogden to forward these goods from
those places respectively to Portland, Oregon, and that he
wrote the following letter on the train:

"GREEN RIVER, Wy., August 1, 1888.

"*R. R. Freight Agent, Ogden, Utah*—DEAR SIR: You will
please forward the following goods to Portland, Oregon:
10 boxes drugs, 7 boxes sundries, 2 boxes liniment, via
McCamman, Oregon Short Line, to Portland; shipped by
Dr. Lee Goodman, Kahoka, Mo., to S. Miller, Ogden, Utah,
on July 28, 1888. If the goods are not at your depot yet,
please wire me at Portland on receipt of this.

"And oblige, respectfully,

"S. W. MILLER.

"P. S.—Let freight charges follow goods, etc.

"P. S.—You can authorize agent at Portland, Oregon, to
take up the bill of lading or freight bill I hold on delivery
of goods at Portland, and send same to you at Ogden, etc.
Need not have goods uncased, if you can prevent it, at
your station, and just forward as directed within this letter."

Plaintiff admitted upon the trial that he wrote this
letter and signed Miller's name to it while on the train
coming west. The condition of the goods at Huntington
was unknown. No bills of lading were issued at Ogden or
Granger when the goods were forwarded from those points.
The goods arrived in Portland in bad condition, more or
less damaged and injured. The plaintiff offered in evi-
dence the way-bills which had been issued by the Union

Pacific Railway Company at Granger and at Ogden, and which accompanied the goods to Portland. These way-bills were admitted with the exception of a certain sentence written in pencil, which was excluded. From these way-bills it appeared that the Hugh Doak shipment of goods when forwarded from Granger, Wyoming, were in bad order and condition—barrels leaking, boxes of glassware rattling, and boxes stained. On the way-bill of the Ogden shipment, issued when the S. W. Miller lot was forwarded from Ogden, there was a notation in lead pencil opposite the stamp mark of the railway office at Pocatello, Idaho (but whether made there or elsewhere did not appear), as follows: "All this shipment badly broken up; all boxes broken; cans spilled and injured; repacked here into 15 boxes; weight, 1,810." This pencil notation on the way-bill was excluded from evidence, as stated heretofore, though the way-bill and its contents, except this pencil notation, was admitted by the court, it having been put in evidence by the plaintiff, having been produced by the defendant on notice from the plaintiff therefor. An exception was taken to the exclusion of the pencil notation on the way-bill, and subsequently and in the course of the trial the defendant itself offered the pencil notation, the plaintiff having offered the way-bill itself, and the court again excluded the pencil notation, and an exception was reserved.

The evidence further tended to show also that the goods at Granger, Wyoming, were in bad condition. The station agent who received them there and the conductor of the freight train that hauled them there were both sworn and testified as to their bad condition—the barrels leaking and the boxes rattling and stained; and the railway agent testified that it was because of this condition that the goods were way-billed out of Granger by the railway company as in bad order and condition, as shown by the way-bill. It having been made to appear that the goods were originally

shipped from Kahoka, Missouri, the defendant identified a certain expense bill, rendered by the Keokuk & Western Railway Company to the Union Pacific Railway Company at Kansas City, and the same was offered in evidence, and excluded by the court, and an exception taken. On the face of this expense bill it appeared that the goods referred to were described as being rough barrels leaking at the bungs, and boxes stained.

The evidence tended to show that it was the course of business among railways, and among others the Union Pacific, to issue way-bills for all goods received for carriage, whether from shippers or from connecting lines, which way-bills accompanied the shipments and were carried with the goods, and upon which way-bills it was usual to note the character, quality, and condition of the goods as far as the same was observable from external appearances.

The evidence tended to show also that with reference to the particular case in question, the Union Pacific Railway Company had issued way-bills to accompany the shipment of goods from Kansas City, one way-bill for the Doak shipment to Granger, Wyoming, and one for the Miller shipment to Ogden, Utah. These way-bills having been identified as issued in the ordinary course of business and accompanying these shipments from Kansas City to Granger, and from Kansas City to Ogden, they were offered in evidence by the defendant, but were rejected by the court, and exceptions were reserved. From these way-bills it appeared that the goods were way-billed out of Kansas City as in bad order and condition, namely, barrels leaking, boxes stained, and glass rattling in boxes. Exceptions to the refusal to receive these way-bills in evidence were reserved.

There was no evidence in the case that any of the goods were injured from negligence or otherwise after the goods arrived at Huntington and between that point and Portland, Oregon, nor was there any evidence that they were

in good condition or well packed or boxed at Huntington, and the bill of exceptions so certifies.

The jury returned a general verdict for the plaintiff for one thousand five hundred dollars, and at the same time returned answers to certain questions submitted to them by the court as follows: "First —Were the goods and merchandise in the complaint mentioned received at Huntington, Oregon, for carriage to Portland? A.—Yes. Second — If the jury answer yes to the foregoing question, then were these goods and merchandise originally shipped from some town in the state of Missouri in July, 1888, consigned one lot to Ogden, Utah, and one lot to Granger, Wyoming? A.—Yes. Third—If the jury answer yes to the last question, then were these goods thereafter and before being taken by the consignee, directed to be forwarded from Granger and Ogden to Portland, and were they carried through from the town in Missouri to Portland by rail? A.— We believe they were. Fourth—Were the goods and merchandise in the complaint mentioned, in July and August, 1888, and before being received at Granger, carried by other railroads east of Huntington and other than the Oregon Railway & Navigation Company road? A.—We believe they were. Fifth—Of the goods and merchandise in the complaint mentioned, was there a shipment comprising part of the same arriving at Granger, Wyoming, before being forwarded from that point to Portland, Oregon; and if so, were these goods and merchandise in good order and condition at Granger, Wyoming, or were they broken and in bad order and condition at that point, and were they in that condition when arriving at Huntington? A.— Slightly leaking and rattling. Sixth—Of the goods and merchandise in the complaint mentioned, was there a shipment comprising part of the same which originally went to Ogden, Utah, before being forwarded to Portland, Oregon, and was this shipment in good order and condition at Huntington, Oregon, and reasonably well packed and

boxed before being there received for carriage and carried
to Portland?   A.—We believe they were.   Seventh—If
the jury find that the plaintiff is entitled to recover, then
state how much of the damages which the jury may find
is assessed for injury or damage to that lot of goods origi-
nally shipped to and arriving at Granger, Wyoming, and
how much of it to that lot originally shipped to and arriv-
ing at Ogden, Utah?   A.— Miller lot, five hundred and
seventy-one dollars and forty cents; H. D. lot, twenty-four
dollars and fifty cents."   The foregoing questions were
submitted at the suggestion of the defendant; the following
at the request of the plaintiff:   "Were the goods in the
complaint mentioned ordered to Portland from Ogden,
Utah, and Granger, Wyoming, respectively, by defendant,
and were they carried and brought forward on such order?
A.—They were."

The court gave judgment on the verdict for the plain-
tiff, from which the defendant appeals.   The exceptions to
the rulings of the court in giving and refusing instruc-
tions, so far as may be necessary to the proper disposition
of the cause, will be noticed in the opinion.

*W. W. Cotton,* and *Gilbert & Snow,* for Appellant.

Generally speaking, and in the absence of an agreement
between a carrier and a shipper, where goods are received
for carriage destined beyond the line of the carrier, the
shipment becomes local as to the initial carrier, whose
liability ceases on delivery to the connecting carrier. (Law-
son's Contracts Carriers, §§ 234, 240; *R. R. Co.* v. *Mfg. Co.* 16
Wall. 324; *R. R. Co.* v. *Pratt,* 22 Wall. 129; *Root* v. *G. W. Ry.*
45 N. Y. 524; *Reed* v. *U. S. Ex. Co.* 48 N. Y. 462; 8 Am. Rep.
561; *Burroughs* v. *Norwich R. R. Co.* 100 Mass. 26; 1 Am.
Rep. 78; *Rawson* v. *Holland,* 59 N. Y. 611; 17 Am. Rep. 394.)

Merely receiving goods marked or receipted for as destined
beyond the line of the initial carrier does not make it a through
shipment.   It is still, as to it, a local shipment, with an

agency for the shipper to forward by connecting lines. (*Root v. G. W. Railway*, 45 N. Y. 524; *Van Santvoord v. St. John*, 6 Hill, 157.)

The declaration of the initial carrier in the expense bill, offered in evidence and rejected, as to the condition of the goods when delivered to the Union Pacific Railway at Kansas City, were admissible as the declaration of the principal, Goodman. So also were they admissible as a part of the *res gestœ*, for, occurring at the time of the delivery for further carriage, they were explanatory of the act of delivery. (1 Green. Ev. §§ 108, 113; *Gilliam v. Sigman*, 29 Cal. 641; *Huntingdon & B. T. R. v. Decker*, 82 Pa. St. 123; *Wheeler v. Hambright*, 9 S. & R. 390.)

A carrier is not liable for injuries to goods arising from improper packing and boxing. (Lawson's Contracts Carriers, § 22; Angel Carriers, § 12; *Klauber v. American Express Co.* 21 Wis. 21; 91 Am. Dec. 452; *The Col. Ledyard*, 1 Sprague, 530.)

A part of a writing or conversation put in evidence entitles the whole to be received. (Hill's Code, § 690; *Rice v. Cunningham*, 29 Cal. 492; *Gilliam v. Sigman*, 29 Cal. 641; *Lawrence v. Fulton*, 19 Cal. 689; *Rounse v. Whited*, 25 N. Y. 170; S. C. 85 Am. Dec. 337; note 342.)

*U. S. Grant Marquam*, and *X. N. Steeves*, for Respondent.

If the goods in the complaint mentioned were in a certain condition when they were shipped at Granger and Ogden, and they came over connecting lines from said places to Portland, Oregon, and at Portland, Oregon, they were found in a much worse condition than at Granger and Ogden, the law presumes the loss or damage occurred on the last line, and the last line or appellant is liable unless it can show when and where the loss occurred. (*Laughlin v. Chicago etc. R. R. Co.* 28 Wis. 204; 9 Am. Rep. 493; Schouler Bailm. 526; *Leo v. St. Paul M. & R. Co.* 30 Minn. 438; *Smith v. N. Y. Central R. Co.* 43 Barb. 225; *Tarbox v. Eastern Steamboat Co.* 50 Me. 339; *Shriver v. Sioux City etc. R. Co.* 24 Minn. 506; 31 Am. Rep.

353; 2 Thompson Trials, § 1861; *Mobile & O. R. Co.* v. *Tupelo Furniture Co.* 67 Miss. 35; 19 Am. St. Rep. 262; Lawson Presumptive Evidence, 166, 171.)

Notations on the way-bills, even if the appellant would show when, where, by whom, and under what circumstances they were made, would not be admissible. (*Julius King Optical Co.* v. *Treat*, 72 Mich. 599; *Hoffman Chicago etc. R. R. Co.* 40 Mich. 60; *Bronson* v. *Leach*, 74 Mich. 713.)

A written memorandum of a fact made by one who, upon being called as a witness testifies to the fact, is not competent evidence of such fact. (*Nat. Bank of Commerce* v. *Meader*, 40 Minn. 325.)

If the goods were in such condition as appellant claims they were, it should have refused to receive them as it would have a right to do. (2 Am. & Eng. Enc. Law, 787; *Union Express Co.* v. *Graham*, 26 Ohio St. 595.)

If a carrier accept goods defectively packed where the defect is apparent, he is liable if the goods are further damaged while in his custody. (2 Am. & Eng. Enc. Law, 854; Schouler Bail. 416; *Shriver* v. *Sioux Cy. R. R. Co.* 24 Minn. 506; 31 Am. Rep. 353; *Higginbotham* v. *Great Northern Ry. Co.* 10 Weekly Rep. 358; *Spring* v. *Haskell*, 4 Allen, 112; *McGregor* v. *Kilgore*, 6 Ohio, 363; 27 Am. Dec. 260; 2 Sedgwick Meas. Dam. § 94.)

STRAHAN, C. J.—The plaintiff by his pleadings seeks to confine the inquiry in this case to the shipment from Huntington to Portland; but during the progress of the trial both sides found it necessary to inquire somewhat into the condition of the goods prior to their arrival at Huntington. The object of this inquiry on the part of the defendant was to furnish the jury some facts by which they might be able to determine the condition of the goods when they were received by the defendant company. As the case went to jury, there was neither allegation nor proof as to whether these goods were in a proper condition for shipment at the time the defendant received them.

The first ruling of the court to which our attention will be directed is the exclusion from the consideration of the jury of the part of the way-bill above referred to written in pencil. The way-bills were issued by the Union Pacific Railway Company at Granger and at Ogden, respectively, and on their face they tended to show that these goods were not in proper condition for shipment when they were started forward from those points by order of the plaintiff. The way-bill issued at Granger tended to show that the Hugh Doak shipment to that point was in bad order and condition — barrels leaking, boxes of glassware rattling, and boxes stained; and the agent at Granger testified that the shipment from that point was way-billed as being in bad order. It was stated in pencil on the face of the way-bill, which accompanied the Miller shipment from Ogden: "All this shipment badly broken up; all boxes broken; cans spilled and injured; repacked here into 15 boxes; weight, 1,810." The court admitted the way-bills except those parts tending to show the condition of the goods. These were excluded. Those parts were then offered by the defendant and again excluded.

Upon the trial here counsel for the appellant urged that these portions of the way-bills were a part of the *res gestæ*, and admissable as a part of the transaction of the shipment. Whether they are a part of the *res gestæ* seems unnecessary for us to determine for the reason we think they were admissible on another ground. The plaintiff introduced the way-bills in evidence, and he could not be permitted to select that part which was favorable to his side of the case, and exclude a part of the same paper which might operate unfavorably. Of course, if it appeared that the part of the way-bill to which the plaintiff objected had been surreptitiously written by some unauthorized person, it could not affect the rights of the parties; but simply finding it in pencil is not enough; for aught that appears it was written at the same time that the other

parts of the bill were written; and the plaintiff having made the way-bill evidence by offering a part of it, the defendant had the right to have the entire paper submitted to the jury for whatever they might think it was worth, and its exclusion by the court was error.

There was no evidence in the cause that any of the goods were injured while being transported from Huntington to Portland, nor did it appear from the evidence that they were in good condition or well packed or boxed at the time the defendant received the same from the Oregon Short Line. On this point the defendant's counsel asked the court to instruct the jury: "First — There is no evidence in the cause that any of the goods in the complaint mentioned were damaged or injured while the goods were in transit between Huntington and Portland, or after having been received at Huntington for carriage. Second — There is no evidence in the cause that the goods in the complaint mentioned were damaged or injured through any carelessness, negligence or misconduct of the defendant, its servants or employés." These instructions covered several allegations made by the plaintiff, and upon which he apparently based his right to recover, in part at least; and having failed to produce any evidence whatever tending to prove them, it was the right of the defendant to have the court tell the jury directly that the plaintiff was without evidence on these parts. Such instructions would have eliminated that much of the plaintiff's contention from the case, thus narrowing the controversy down to the precise and definite point upon which it must turn.

The defendant also asked the court to instruct the jury as follows: "As between shipper and carrier of goods, it is incumbent upon the shipper to so reasonably and securely pack the same that they would not be injured from the ordinary and usual incidents attendant upon a shipment of the same from one point to another, and if the goods be in their nature perishable or encased in glass

so as to be susceptible of easy breakage, greater care is required of the shipper in the matter of packing and boxing to prevent breakage. A carrier is not liable for injury or damage to goods arising from insecure or imperfect packing or boxing; and if in this case the jury believe that the goods in the complaint mentioned were so imperfectly packed or boxed, and that thereby and by the ordinary incidents arising from transportation of such goods the damage and injury complained of arose, the verdict should be for the defendant."

The general rule on the subject of the liability of common carriers of goods is said to be that they are liable for all losses excepting those caused by the act of God or the public enemy, but this definition is said to be misleading. "More correctly it may be said that the carrier is not liable: (1) For losses caused by the act of God; (2) losses caused by the public enemy; (3) losses caused by the inherent defect, quality, or vice of the thing carried; (4) losses caused by the seizure of goods or chattels in his hands under legal process; (5) losses caused by some act or omission of the owner of the goods." (Lawson Carriers, 5, 6.) And further on, the same author states the principle more fully. He says: "Carriers are not liable for losses arising from the ordinary wear and tear of goods in the course of transportation, nor for their ordinary deterioration in quantity or quality, nor for their inherent natural infirmity or tendency to damage; and this rule includes the decay of fruits, the diminution, leakage, or evaporation of liquids, and the spontaneous combustion of goods. In all such cases, where the negligence of the carrier does not coöperate in the loss, he will be excused. This exception also includes all injuries done by living animals to themselves and to each other; losses that are caused by their inherent vices and propensities and which excuse the carrier if his negligence does not concur in causing them." (Lawson Carriers, 15, 16.) And the same principles are stated in 2 Am. & Eng. Ency. Law,

853, and abundantly supported by an array of authorities not to be questioned. The instruction asked substantially covered this view of the carrier's responsibility and should have been given.

The ninth instruction asked by the defendant embodied a correct principle of law, and should have been given. The instruction is as follows: "Ninth—If the jury believe from the evidence that the goods in the complaint mentioned were received at Huntington by the defendant for carriage to Portland, that they were carried by the defendant and arrived in Portland in the condition in which they were received, the verdict should be for the defendant." But the failure to give this instruction would not of itself be sufficient to reverse the judgment for the reason the court gave it substantially in its general charge. But in addition to this, the court told the jury among other things that "the history of the transit from Granger and Ogden to Huntington, may or may not have been presented by this testimony, but the goods ought to be presumed by you to be in no worse condition at Huntington than they were at Granger and Ogden. They could hardly be presumed to be in any better condition, but they ought not to be presumed in any worse condition than they were at Granger and Ogden." Under the particular facts of this case, it seems to us this instruction was inapplicable and did not declare the correct rule of law.

There was some evidence before the jury tending to prove that at one of the points east of Huntington the barrels were leaking at the bungs, glass rattling in the boxes, and the boxes were stained. These facts would clearly indicate that the goods were not in a safe or proper condition for transportation at that time; and it was a question of fact for the jury to find from the evidence what the condition of the goods was when the defendant received them, and whether or not their further transportation in that condition did reduce them to a worse condition than when

they were received.   It was not a case, then, where any pre-sumption could be invoked, but. a question of fact to be found solely upon evidence.   *The Missouri Pac. R. R. Co.* v. *Breeding,* 16 S. W. Rep. 184, is authority on this point.   In that case, the court having this question under considera-tion, said: "Negligence or a failure to perform a duty required by law is never presumed as a fact, but must be proved by evidence; and .the burden of proving it is on the party seeking a recovery of damages by reason of such negligence or failure of duty.   The machine was second-hand, and the plaintiff introduced no evidence showing that it was in good condition or what was its condition when received by the company for shipment."

Some other questions were presented at the argument, but we have not deemed their consideration necessary to a proper disposition of this case; but for the errors already referred to, the judgment must be reversed and a new trial awarded.