FREMONT, ELKHORN & MISSOURI VALLEY RAILROAD COMPANY v. NEW YORK, CHICAGO & ST. LOUIS RAILROAD COMPANY ET AL.

NEW YORK, CHICAGO & ST. LOUIS RAILROAD COMPANY v. FREMONT, ELKHORN & MISSOURI VALLEY RAILROAD COMPANY ET AL.

FILED OCTOBER 22, 1902.    NOS. 11,101, 11,113.

Commissioner's opinion, Department No. 3.

1. **Railroad Companies:** TRANSPORTATION: JOINT CONTRACT: EXPRESS CONTRACT: LIMITED LIABILITY. Although a railroad company enters into a joint contract with another such company for the transportation of goods to a point beyond the end of its own line, it is competent for it to enter into an express contract with the shipper limiting its liability to the transportation of the property over its own line.

2. ———: SOLICITING AGENT: FOREIGN RAILROAD COMPANY: SAFE DELIVERY OF GOODS: POWER OF AGENT TO BIND PRINCIPAL. An agent employed to solicit traffic for a foreign railroad company, having no line of road in this state, has implied authority to bind his principal for the safe delivery of goods at a point

beyond its own line, and to contract over what road beyond that line the property shall be transported.

3. **Foreign Railroad Company:** MANAGER OF SOLICITING AGENCY: SERVICE OF SUMMONS: MEANING OF STATUTE. A manager of an agency established in this state by a foreign railroad corporation for the purpose of soliciting traffic over its line of road, is a managing agent within the meaning of the statute with reference to the service of summons upon such corporations.

ERROR from the district court for Clay county. Judgment for plaintiff the Union State Bank. Tried below before HASTINGS, J. Defendants bring separate proceedings in error. Judgment *reversed* as to the Fremont, Elkhorn & Missouri Valley Railroad Company and *affirmed* as to the New York, Chicago & St. Louis Railroad Company.

*Benjamin T. White, James B. Sheean* and *Leslie G. Hurd,* for the Fremont, Elkhorn & Missouri Valley Railroad Company.

*John C. Stevens,* for the New York, Chicago & St. Louis Railroad Company.

*Thomas H. Matters,* for the Union State Bank.

AMES, C.

This is an action to recover damages for injuries to a car-load of horses, alleged to have been suffered in the course of transportation from Harvard, in this state, to Belvidere, New Jersey. On the 13th day of February, 1897, the plaintiff below, the Union State Bank, entered into a contract for the shipment of the horses, which was signed by an agent of the bank and an agent of the plaintiff in error, the Fremont, Elkhorn & Missouri Valley Railroad Company, the terms of which, so far as they are pertinent to this controversy, are as follows: "Harvard, Nebraska Station, February 13, 1897. Hour: 3:10 p. m.: Received of Union State Bank, one car horses to be delivered to Nickel Plate Road for Belvidere, New Jersey, at Union Stock Yards Station, Chicago, Illinois. * * * And

in this case the railroad company upon whose road the accident, loss, or damage shall occur, shall alone be liable therefor, and no suit shall be brought, or claim made, against any other company (forming a part of the route) for such loss or damage (it being expressly understood and agreed that the responsibility of these companies shall cease upon delivery of said property to their connecting line, unless otherwise agreed to in writing, and said written agreement signed by the respective parties hereto)." It is not disputed that the Fremont, Elkhorn & Missouri Valley Railroad Company literally kept the stipulations, performance of which was imposed upon it by this contract; and it is not contended that the horses suffered any injuries, for which damages are recoverable, during their transit from Harvard to and until their delivery to the plaintiff in error the New York, Chicago & St. Louis Railroad Company, commonly called the "Nickel Plate Road," at the Union Stock Yards station in Chicago. The facts thus far stated are either admitted or proved without contradiction, and if this was all there is of the case, the record would present no matter of legal controversy, because there would be no question that the trial court erred in refusing to instruct the jury that the Fremont, Elkhorn & Missouri Valley Railroad Company had incurred no liability.

Section 5 of article 1, chapter 72, of the Compiled Statutes,* which is much relied upon by the defendant in error, would be without applicability to such a state of facts for several reasons, among which are that this section has reference to the legal effect, not of express contracts between shippers and railroad companies, but to that of notices by the latter to the former, which are quite different matters; and further, that in the absence of evidence of fraud or mistake a party is conclusively presumed to have had notice of the contents of formal written contracts executed by him; and, finally, that the company appears to have fully discharged and satisfied every liability incurred by it as a

---

* Cobbey, Annotated Statutes, sec. 10045.

common carrier, so that if the contract does by its terms purport to limit such liability, there is no fact nor circumstance connected with the transaction upon which the limitation could have had operation.

At and before the making of this contract and the shipment of the horses, and subsequently, the plaintiff in error, the New York, Chicago & St. Louis Railroad Company maintained an office at the City of Omaha, in this state, under the general charge of one Bernard E. Morgan, for the purpose of carrying on the business of securing freight and traffic to be carried on over its lines of road, extending eastward from Chicago and St. Louis. In the conduct of this business Morgan was authorized to employ and did employ subagents or solicitors, among whom was one A. L. Armstrong. Shortly before the date above mentioned Armstrong obtained through one Betzner, a traveling freight agent of the Fremont, Elkhorn & Missouri Valley road, an introduction to the officers and agents of the plaintiff bank, and solicited from them the routing of the horses eastward from Chicago over the line of the corporation represented by him. As a result of this solicitation, and of negotiations and agreements growing out of it, the horses were on the day of the making of the above contract, and as a part of the same transaction, shipped on board the cars of the Fremont, Elkhorn & Missouri Valley Company, at Harvard, and a bill of lading was issued therefor by the latter, naming N. B. Updike, an agent of the plaintiff bank, as both consignor and consignee, and Belvidere, New Jersey, as the place of destination, by way of the "Nickel Plate Road." At the same time the total amount of freight charges from Harvard to Belvidere was paid to the agent of the Fremont, Elkhorn & Missouri Valley Company, who alone signed the bill of lading. There was no written stipulation with respect to the lines over which the horses should be transported beyond the eastern terminus of the New York, Chicago & St. Louis Company, but the evidence is practically without dispute that it was orally agreed between Updike, the agent of the bank, and Armstrong,

that they should be carried from Buffalo to Phillipsburg
over the Lehigh Valley & Hudson River road and from the
latter point to Belvidere over the Pennsylvania road, and
that this agreement was an indispensable inducement to
Updike to consent to their being delivered to the New York,
Chicago & St. Louis Company. The shipment was diverted
at Wilkesbarre to another railroad, upon which it is al-
leged that the animals suffered the injury for which dam-
ages are claimed, on account of the lack of facilities of the
company for caring for them, and as a consequence of the
negligence and wrongful conduct of its agents and em-
ployees. The plaintiff below recovered a verdict and judg-
ment against both defendants jointly, and the railroad
companies, having filed separate motions for a new trial,
prosecute separate petitions in error to this court.

With respect to the Fremont, Elkhorn & Missouri Valley
Company, it is entirely clear that it was entitled to a
peremptory instruction in its behalf, unless it is obligated
in some manner not indicated by the above-quoted con-
tract between itself and Updike, the agent of the bank. It
does not appear to us that it was so obligated. The con-
tract mentioned, the bill of lading, the conversations be-
tween Updike and Armstrong, the agent of the Nickel-
Plate, and the shipment of the horses, were all of the same
date and parts of the same transaction. It can not rea-
sonably be supposed that the way-bill and the receipt of
the tariff charges by Kempster, the local freight agent of
the company, were intended or supposed by the parties or
any of them to have the effect of superseding and annulling
the terms of the formal contract explicitly reciting and de-
fining the duties of the company. They are more properly
to be regarded as additional and supplemental thereto, and
as having had for their main purpose the carrying out of
the agreement between the shipper and Armstrong, the
routing of the property from Chicago to its destination by
way of the New York, Chicago & St. Louis Railroad Com-
pany and the other lines mentioned, and the collecting for
the last-named company of the charges for the transporta-

tion beyond Chicago. To this extent the case is analogous to that of a contract made in the name of one party for the benefit and in the behalf of another. In such cases it is true that, as a general rule, both the party beneficially interested and the person by and in whose name the contract is made are liable for its breach. But we think that in the case at bar the agreement first above mentioned limited and qualified that created by the bill of lading and shipment, and is sufficient to overcome the presumption otherwise arising from these facts and the collection of the freight charges. By this construction the several agreements, oral and written, and the circumstances of the transaction, appear to be consistent with themselves and with each other, and such a construction is obligatory upon the courts in all cases in which the relation of the parties and the subject-matter of the agreements and the attendant facts will permit of it. We are therefore of opinion that the decision of this court in *St. Joseph & G. I. R. Co. v. Palmer,** 38 Nebr., 463, is not applicable to this feature of the case at bar. The sum paid by the shipper to the Fremont, Elkhorn & Missouri Valley Company was the aggregate of freight charges for the whole distance over which the animals were to be carried; and all the facts, taken together, disclose a joint contract on the part of the two companies to transport the property from Harvard, Nebraska, to Belvidere, New Jersey, but their respective liabilities were so distributed that that of the last-named company was restricted to safe delivery to the connecting line at Chicago. This restriction was not, under the circumstances, invalid, or a limitation of the common-law liability of the Fremont, Elkhorn & Missouri Valley Company, in violation of the constitution or statutes of this state, because, as is recognized in the opinion in the case above cited, a common carrier is not bound to accept goods for transportation beyond the end of its own line, and it follows that, although it may bind itself jointly with another carrier for the safe delivery of the property to the latter at that point, it may, by express stipulation, relieve

*22 L. R. A., 335.

itself of responsibilty with the connecting line for the further carriage of it. That a railroad company is not, in the absence of an express or implied contract, bound for the transportation of property beyond the terminus of its own road, was expressly ruled by this court in *Fremont, E. & M. V. R. Co. v. Waters,* 50 Nebr., 592, and such is the great weight of authority in this country. *Myrick v. Michigan C. R. Co.,* 107 U. S., 102, 106. See, also, *Mulligan v. Illinois C. R. Co.,* 36 Ia., 181, 186, 14 Am. Rep., 514; *Detroit & M. R. Co. v. Farmers' Bank,* 20 Wis., *123; *Berg v. Atchison, T. & S.F.R.Co.,* 30 Kan., 561, 2 Pac. Rep.,639; *Taylor v. Little R., M. R. & T. R. Co.,*32 Ark., 393; *Central Railroad & Banking Co. v. Avant,* 80 Ga.,195; *Savannah, F. & W. R. Co. v. Harris,* 26 Fla., 148; *Goodman v. Oregon R. & N. Co.,* 22 Ore., 14, 28 Pac. Rep., 894; *McCarn v. International & G. N. R. Co.,* 84 Tex., $52; *Wichita V. R. Co. v. Swenson,* 25 S. W. Rep. [Tex.], 47; *Pendergast v. Adams Express Co.,* 101 Mass., 120; *American Express Co. v. Second Nat. Bank,* 69 Pa. St., 394; *Jennings v. Grand T. R. Co.,* 127 N. Y., 438.

But it was held in *St. Joseph & G. I. R. Co. v. Palmer, supra,* that such a contract may be implied from the receipt of freight charges for the whole distance, and its existence is further established in this case by the uncontradicted evidence of conversations between the shipper and Armstrong, the agent of the New York, Chicago & St. Louis Company, which established an agreement not contradictory, but supplemental, to that implied by the bill of lading and other circumstances above detailed, and which were, as has been said, a part of the same transaction. There is, therefore, no variance between the proof and the petition as respects the joint character of the contract on the part of the two railroad companies. It is undisputed that the horses were diverted from the route specified in the oral agreement, as alleged in the petition of the plaintiff, and that after their diversion they were injured while in the custody of the carrier. All of the foregoing matters are, therefore, to be disposed of as questions of law, and it

is unnecessary to discuss any of the instructions complained of, except the refusal to give a peremptory instruction for a verdict.

There was at the trial no question properly to be left to the jury, except that of the amount of damages, concerning their disposition of which there is no complaint in the briefs of the plaintiffs in error. But it is insisted that Armstrong, the solicitor of the New York, Chicago & St. Louis Company, had no authority to stipulate concerning the route of the shipment beyond the line of his employer, or to contract a liability for carriage beyond that line, and that Morgan, upon whom service of summons was made in this case, was not a managing agent of the company within the meaning of our statutes. Neither of these objections is well taken. Morgan was the manager of an agency maintained in this state for the express purpose of soliciting traffic for his corporation, which was foreign to this state, and had no line of road entering its territory, and Armstrong was one of his employees in the business. Such persons, by the very nature of their employment, are represented to the public to have authority to do any act or enter into any contract for their principal pertaining to the business which they have in charge, and which has a tendency to promote its successful conduct. Obviously, one of the most frequently requisite of such acts would be the routing* of goods over the defendant's line as an intermediate line to points of destination. Without such routing* the shipment in question could not have been secured, and the case may be taken as fairly illustrative of the character of the business in which the agency was engaged.

It is recommended that the judgment of the district court, in so far as it affects the plaintiff in error, the New York, Chicago & St. Louis Railroad Company, be affirmed, and that in so far as it affects the plaintiff in error, the Fremont, Elkhorn & Missouri Valley Railroad Company, it be reversed and a new trial granted.　　　　●

* I have not been able to find this participle given the meaning it has in this opinion in any dictionary at hand. It is a railroad term. —W F. B.

By the Court: For reasons stated in the foregoing opinion, it is ordered that the judgment of the district court, in so far as it affects the plaintiff in error the New York, Chicago & St. Louis Railroad Company, be affirmed, and that in so far as it affects the plaintiff in error the Fremont, Elkhorn & Missouri Valley Railroad Company, it be reversed and a new trial granted.

JUDGMENT ACCORDINGLY.

DUFFIE, C., concurring.

I concur in the conclusion reached in the foregoing opinion, and with the reasons given therefor. To my mind it is plain that there is no conflict between this case and the case of *St. Joseph & G. I. R. Co. v. Palmer*, 38 Nebr., 463. The facts in this case are so different from those in the *Palmer Case* that the latter can not be considered a precedent by which this should be ruled. In the *Palmer Case* a bill of lading was issued which limited the liability of the receiving company to its own line, which extended to Grand Island, twenty-four miles distant from Hastings, the place of shipment. The plaintiff insisted that he had made an oral contract with the agent of the road for the carriage of his goods to their destination, Grant's Pass, Oregon; that the agent had received the freight charges for the entire distance; and that he signed the bill of lading issued by the company in the belief that it was a receipt for the freight charges paid and in ignorance of the clauses therein limiting the liability of the company. The principal controversy in that case was in relation to the terms of the contract of shipment; the plaintiff insisting that the contract was an oral one that provided for the through shipment of his goods, and that his signature to the written contract or bill of lading had been fraudulently obtained in the belief that it was a receipt, while the company insisted that the bill of lading truly set forth the real contract entered into by the parties, and that its liability did not extend beyond its own line. The bill of lading contained a clause limiting the liability of the car-

rier to $5 per 100; and the opinion, after calling attention to article 11, section 4, of the constitution, which prohibits any limitation upon the liability of a railroad company as a common carrier, and to former decisions of the court holding that such liability can not be limited even by express contract, then turns to a discussion of the question whether the company's contract of carriage was to the end of its own line, and delivery to the next carrier, or to the final point of delivery. Relating to this question the opinion is as follows: "It is said that at common law the common carrier is not liable for loss, in the absence of special contract, beyond the point at which it delivered the goods to a connecting carrier. To this it should be added that the contract of the shipper was with the carrier first receiving the goods, and if such carrier undertook to deliver the goods at their destination, even though it contemplated doing so through intermediate carriers, it assumed a liability of such character for every part of the route. Many cases hold that receiving goods marked for a point beyond the end of the receiving carrier's route is evidence of a contract to deliver them as marked. In this case the bill of lading was executed in duplicate. In one of the copies the destination was left blank; in the other the language was: 'Received of Palmer & Pardee the following described package, in apparent good order, marked and consigned as noted below, contents and value unknown, to be transported to Grant's Pass, Ore., and delivered at the railroad depot at that point.' Both copies in writing show that the goods were consigned to Pardee at Grant's Pass, Oregon. The negotiations as to the freight were, according to the uncontradicted testimony, with a view to prepayment all the way through. Hastings was only twenty-four miles from Grand Island, where the car was delivered to the Union Pacific; and the $200 received by the railroad company, if not intended as a full prepayment of the freight to Oregon, was certainly intended to apply on the freight throughout the whole distance. There is no possible view of the evidence from which it could be inferred that

the railroad company had only contracted to deliver the goods to the next carrier." It will be observed that the opinion treats the payment to the first or initial carrier of the freight charges for the whole distance as presumptive only that the contract of carriage was a through contract; and that, together with the fact that the goods were received at a point but twenty-four miles distant from the terminus of its line and that the bill of lading itself recited that the goods were "to be transported to Grant's Pass, Ore., and delivered at the railroad depot at that point," was conclusive that the contract was one for through shipment. We entirely agree with the writer of the opinion, under the facts in that case, that "there is no possible view of the evidence from which it could be inferred that the railroad company had only contracted to deliver the goods to the next carrier." The bill of lading in the case at bar recites the following: "Received of Union State Bank one car horses to be delivered to Nickel Plate Road for Belvidere, N. J., at Union Stock Yards, Chicago, Ill., Station." As we interpret this agreement, the contract of carriage extends to Chicago only, and the circumstances under which it was made give force to this construction. The evidence shows that some time previous to February 13, 1897, one Armstrong, a freight solicitor of the Nickel Plate Road, learned that the Union State Bank was about to ship two cars of stock from Harvard, Nebraska, to Belvidere, N. J., and requested L. G. Kempster, the local agent of the Elkhorn Company, to introduce him to the officers of the bank. The Elkhorn Company had already secured the shipment to Chicago, and was not interested in the shipment east of that point. The introduction was made as requested, and Armstrong contracted to receive the shipment at Chicago from the Elkhorn Company, to transport the same over the Nickel Plate Road to Buffalo, and to forward it to its destination over certain roads named by the bank. When shipment was made on the 13th, the bill of lading was made out and signed by the parties. The freight charges for the entire route were paid to the Elk-

horn Company, and this, in the absence of a special agreement to the contrary, would be presumptive that the company had contracted to deliver the freight at Belvidere, New Jersey, its ultimate destination; but in the face of the express agreement which, as we have said, is a contract on the part of the Elkhorn Company to carry to Chicago only, its liability as carrier ceased at that point, and that company can not be held liable for injuries to stock received on the other lines over which it was being transported. As said in *Fremont, E. & M. V. R. Co. v. Waters,* 50 Nebr., 592, "a railroad company receiving for shipment goods consigned to a point on the line of a connecting carrier, under an agreement to transport them to the terminus of its own road, is neither at common law nor by statute of this state answerable therefor after their safe delivery to the connecting line named in the bill of lading or contract of shipment."

ALBERT, C.

On a re-examination I fully concur in the foregoing.