THE MISSOURI PACIFIC RAILWAY COMPANY, PLAINTIFF IN ERROR, v. M. H. VANDEVENTER ET AL., DEFENDANTS IN ERROR. .

[FILED MARCH 20, 1889.]

1. **Railroads**: LIABILITY AS COMMON CARRIERS. A railroad company operating a line of railroad in this state, is a common carrier, and cannot, under the provisions of the constitution, limit its liability as such by special agreement with a shipper.

2. **Trial**: INCOMPETENT EVIDENCE. When upon a trial, evidence, incompetent or illegal but which tends to prove the case of the side offering it, is admitted without objection, and considered by the jury in agreeing upon their verdict, the incompetency or

illegality of such evidence will not be considered on error or appeal.

3. ——: VERDICT: SPECIAL FINDING: ERROR WITHOUT PREJU-
DICE. When upon a trial to a jury immaterial or improper
questions for special findings are submitted to a jury at the re-
quest of a party afterward complaining, and the jury is dis-
charged without answering such questions, *held*, error without
prejudice.

ERROR to the district court for Richardson county. Tried below before BROADY, J.

*B. P. Waggener*, and *Isham Reavis*, for plaintiff in error, cited: *Doom v. Walker*, 15 Neb. 339; 19 Central Law Journal, 164; *Wabash, St. Louis, & Pacific R. R. Co. v. Black*, 11 Bradw. 465; *Dawson v. St. Louis, Kansas City & Northern R. R. Co.*, 76 Mo. 514; *Moore v. Great Northern Ry. Co.*, 10 L. R. (Ir.) 95.

*Frank Martin*, for defendant in error, cited: Sec. 4, art. 11, Const. of Neb.; *A. & N. R. R. Co. v. Washburn*, 5 Neb. 117.

COBB, J.

This action was brought in the district court of Richardson county by the defendants in error against the plaintiff in error, for $256.50, the alleged value of fifteen hogs, being part of a car load of hogs shipped by the defendants in error over the railroad of plaintiff in error from Stella, Nebraska, to Kansas City, and which were claimed to have been lost by reason of the negligence of the railroad company.

The defendant in said action, among other defenses, alleged, in its answer, that no notice was given defendant of such pretended loss of hogs before removing the remainder from the car at Kansas City, as by the terms of the shipping contract plaintiffs were bound to do as a condition

precedent to a right to demand of defendant reparation for any loss which might occur in the shipment of said stock.

The cause was tried to a jury, which returned a verdict for the plaintiffs with damages of $334.55.

The following interrogatories were submitted by the court to the jury for special findings of fact:

1. Was the company or its agents guilty of any negligence in the transportation of the hogs? and if the jury answer Yes, they will say in what particular the company was negligent.

To which the jury answered, Yes; in the delay of the car containing the hogs, from Hiawatha to Atchison, Kansas, of twenty-four hours.

2. Was notice in writing of the loss of fifteen hogs given the defendant before the stock was mingled with others, or removed from the place of destination?

To which they answered, We don't know.

The defendant's motion for a new trial having been overruled, and judgment having been entered on the verdict, the cause is brought to this court on error. The errors assigned are numerous; but such only as are discussed in the brief of counsel will be considered. These arise chiefly upon the construction and legal effect to be given to certain clauses in the contract of shipment, and the effect to be given to the evidence introduced by the defendant in the court below as to the number of hogs shipped, and the number delivered by the railroad company at the place of delivery.

Morgan H. Vandeventer, one of the plaintiffs, testified in their behalf that he shipped a car of hogs on May 29, 1883, from Stella, Nebraska, to Kansas City, Missouri, consigned to A. J. Gillispie & Co.; that there were sixty-nine hogs shipped, and that when the car reached the Kansas City stock yards there were but fifty-four; that the average weight was 261 pounds, and a fraction over; that the hogs were worth in the market $6.80 per 100.

On cross examination by counsel for defendant below, the witness stated that he received most of the hogs the day before he shipped them; that he had asked for a car, and when it was sent, found it was a large thirty-three-foot car, and that his stock would not all be in, in time to ship that day; that there were a few hogs he expected that did not come, and finding that he had engaged a large car, he contracted for more hogs to come in the next morning; that he had on his books the names of parties who brought in hogs each day, the number, and price paid, and that fifty-three hogs came in on the first day; that he separated the hogs in the evening, and there were no other hogs in the yard at the time; that there were two yards in the north side of the shute, and he put a part in the north side, a part in the southwest corner in the south side, and cut out two little ones that he got in, by themselves; * * * that the next morning he let them all by together, and found he had fifty-three in the yard; that he received there between that and loading time, (referring to his book,) five from Witters, one from Jones, five from McKinnegar, and five from Dresser, making sixteen that morning, and making sixty-nine hogs in all.

In answer to the question, When did you find out there was a shortage in your hogs? the witness answered: At that time they (the plaintiffs) were operating mostly on the B. & M., (Burlington & Missouri River R. R.,) and had their head-quarters with Mr. Lincoln, at Salem. All returns were made to Mr. Lincoln at that time, and it was two or three days before he was down at Salem, and when he went there Mr. Lincoln showed him the bill. It was two or three days after the shipment.

He further testified on cross-examination:

Q. What do you know about the reception of the hogs at Kansas City? who received them?

A. A. J. Gillispie is the man we consigned them to; he received them.

Q. He is a commission merchant?

A. Yes.

Q. You consigned the hogs to him?

A. Yes.

Q. Did he make any report to you?

A. Why, he was not aware, until we got the sale bill and notified him, that there was a shortage in the hogs.

Q. What sale bill do you mean?

A. The bill we received from him for the sale of the hogs in the yard.

Q. He could have got no information from the contract as to the number — that was "one car load of hogs?"

A. Yes, one car load; the agent did not count the hogs, and did not give it in the bill.

Q. What did you say?

A. I say at that time the Missouri Pacific agent did not count the hogs. He told me he was not required to do so; for that reason there was no number stated in the bill — just one car of stock.

Q. Then Mr. Gillispie received his information from you?

A. Yes; when we heard from him and found there was a shortage.

Q. How long after you received notice from your consignee did you give notice to the railroad company that some hogs were missing?

A. It was not a great while. It might have been a week — from three or four days to a week.

John H. Myers, witness for the defendant below, testified: That in 1883 he was engaged in running a freight train as conductor, on the night of May 30, 1883, on the Missouri Pacific railroad, between Kansas City and Atchison; that he took possession of the train coming from Stella, Richardson county, Nebraska; that he recognized the number of the car in which plaintiff's hogs were shipped, as one of the cars of that train; that he remembered the

circumstance from the fact that when there is a shortage they always send back to the conductor for examination; when anything is lost in transit they send to the conductor, and ask for a statement of the car and its contents and its condition; that he was called on for a statement of the facts in regard to this car, and from that fact he remembered the circumstances. Witness further described the different manner of sealing the cars; that it was the duty of the freight-train conductor, upon receiving a freight train, to go and look at the cars and see that they were properly sealed, describing the manner of doing it, and stated that was done in the case of this car; that the doors on both sides were sealed, and the seals intact; that he arrived in Kansas City with the train at about three o'clock A. M., being one hour late, and turned the train over to the yardmaster with all the seals intact.

Frederick H. Mickelwait, witness for defendant below, testified: That on or about May 29, 1883, he was freight conductor on the Missouri Pacific railroad line between Louisville, Nebraska, and Hiawatha, Kansas; that he conducted the train having car 4587, containing the hogs in question; that he received the car at Stella, and delivered it at Hiawatha; that on receiving it he made an examination of the seals and found them "O. K.;" and that they remained untampered with until he delivered them to the next conductor, at Hiawatha, at about 2:45.

On the trial, the plaintiffs introduced in evidence the following contract:

"RULES AND REGULATIONS

FOR THE

"*TRANSPORTATION OF LIVE STOCK.*

"*Live stock* of all kinds at the following estimated weights: First-class rates: One horse, mule, or horned animal, 2,000 pounds; two horses, mules, or horned animals, 3,500 pounds; three horses, mules, or horned animals,

5,000 pounds; each additional animal to be rated at 1,500 pounds; jacks or stallions, 4,000 pounds each; calves, hogs, and sheep, each, 300 pounds.

"In case the consignor agrees to save the Missouri Pacific Railway Company from liability for any or all the causes enumerated in the following contract, and also agrees to load, unload, feed and water, and attend to the stock himself, etc., as specified therein, the special rates of tariff based on such contract will be given.

"The said Missouri Pacific Railway Company, as aforesaid, will not assume any liability over one hundred dollars per head on horses and valuable live stock, except by special agreement. For the purpose of taking care of the stock, the owner or men in charge will be passed on the train with it, and all persons thus passed are at their own risk of any personal injury from any cause whatever, and must sign release to that effect indorsed on contract.

### "LIVE STOCK CONTRACT.

| No. of Cars. | Initials. |
|---|---|
| 4587 | Mo. P. |

"STELLA STATION, May 29, 1883.

"This agreement, made between the Missouri Pacific Railway Company, of the first part, and M. H. Vandeventer, of the second part, Witnesseth: That whereas the Missouri Pacific Railway Company, as aforesaid, transports live stock only as per above rules and regulations: Now, in consideration that the said party of the first part will transport for the said party of the second part one car load of hogs to Kansas City station, at the rate of $37 per car load, the same being a special rate lower than the regular rates mentioned in their tariff, the said party of the second part hereby releases the said party of the first part from the liability of a common carrier in the transportation of said stock, and agrees that such liability shall be only that of a private carrier for hire; and from any liability for any delay in shipping said stock after the delivery thereof to the

agent of said party of the first part, or for any delay in receiving the same after having been tendered to said agent.

"And said party of the second part hereby accepts for such transportation the cars provided by said first party, and used for the shipment of said stock, and hereby assumes all risk of injury which the animals or either of them may receive in consequence of any of them being wild, unruly, or weak, of maiming each other or themselves, or in consequence of heat or suffocation, or other ill effects of being crowded in the cars, or on account of being injured by the burning of hay, straw, or other material used by the owner, for feeding the stock or otherwise, and all risk of damage that may be sustained by reason of any delay in such transportation, and all risk of escape or robbery of any portion of said stock, or of loss or damage from any other cause or thing not resulting from the willful negligence of the agents of the party of the first part.

"And said party of the second part further agrees that he will load, unload, and reload, said stock at his own risk, and feed, water, and attend to the same, at his own expense and risk, while it is in the stockyards of the party of the first part awaiting shipment, and while on the cars, or at feeding or transfer points, or where it may be unloaded for any purpose.

"And it is further agreed that said party of the second part will see that said stock is securely placed in the cars furnished, and that the cars are safely and properly fastened, so as to prevent the escape of the stock therefrom.

"And it is further agreed that in case the said party of the first part shall furnish laborers to assist in loading and unloading said stock at any point, they shall be subject to the orders and deemed the employés of the said party of the second part while so assisting.

"And for the consideration before mentioned, said party

of the second part further agrees, that as a *condition prece-dent* to this right to recover any damages for any loss or injury to said stock, he will give notice in writing of his claim therefor to some officer of said party of the first part, or its nearest station agent, before said stock is removed from the place of destination above mentioned, or from the place of delivery of the same to said party of the second part, and before said stock is mingled with other stock.

"And the said party of the second part, in consideration as aforesaid, further agrees that in case of total loss, the sum of one hundred dollars per head shall be taken and deemed as liquidated damages for such loss ; and in case of injury or partial loss, damage shall be measured in the same proportion.

"This contract does not entitle the holder or other par-ties to ride in the cars of any train except the train in which his stock, referred to herein, is drawn or taken.   Neither does it entitle him (and the party of the second part named in this contract so expressly stipulates, admits, and agrees) to return passage from ——— to ———, unless this said contract is presented within five days·from the date hereof. Nor does it entitle any person except the party of the sec-ond part, and parties who accompany·him in charge of said stock for the purpose of assisting him in taking care of them, as specified in and upon this contract, (and does not include women, infants, or other persons unable to do and perform the services required, as expressed in this con-tract,) to return passage within the said five days; the ob-ject, purpose and intent of the return pass being to enable the said party of the second part hereto, or his men in charge as expressed in contract, and no other person, to re-turn to ——— thereon, at any time within five days from date hereof, and not thereafter.

"And it is further stipulated and agreed between the par-ties hereto, that in case the live stock mentioned herein is to be transported over the road or roads of any other rail-

road company, the said party of the first part shall be released from any liability of every kind after said live stock shall have left its road; and the party of the second part hereby so expressly stipulates and agrees; the understanding of both parties hereto being that the party of the first part shall not be held or deemed liable for anything beyond the line of the Missouri Pacific Railroad Company, excepting to protect the through rate of freight named therein.

"The evidence that the said party of the second part, after a full understanding thereof, assents to all the conditions of the foregoing contract, is his signature hereto.

"[Signed]          F. R. MASON, *Agent,*

"*For the Missouri Pacific Railway Company.*

"M. H. VANDEVENTER, *Shipper*."

Under this contract it is claimed by the plaintiff in error that the defendants in error, not having given notice in writing of their claim for reimbursement to some officer of the railroad company, or to its nearest station agent, before the removal of the car load of hogs from its place of destination, or from its place of delivery to the shipper, and before the stock was mingled with other stock, have therefore no right of action against said railroad company for a loss of any portion of said hogs.

The plaintiff in error cites, in support of this, 19 Central Law Journal, 164; also, *Wabash, St. Louis & Pacific R. R. Co. v. Black,* 11 Bradw. 465; *Dawson v. St. Louis, Kansas City & Northern R. R. Co.,* 76 Mo. 514; and *Moore v. Great Northern Ry. Co.,* 10 L. R. Ir. 95.

This article, and these cases, are to the effect that the law governing common carriers, both in England and America is to-day substantially as laid down by Lord Holt in the year 1703, quoted in the article cited, that "the law charges this person, thus intrusted to carry goods, against all events but acts of God and the public enemy."

But, in the language of Mr. Justice Strong, in the opin-

ion of the supreme court of the United States in the case of *Express Co. v. Caldwell,* 21 Wallace, 264: "Notwithstanding the great vigor with which courts of law have always enforced the obligations assumed by common carriers, and understanding the reluctance with which modifications of that responsibility imposed upon them by public policy have been allowed, it is undoubtedly true that special contracts with their employers limiting their liability are recognized as valid if, in the judgment of the court, they are just and reasonable; if they are not in conflict with sound legal policy."

This opinion, last above cited, was delivered in October, 1874, and scarcely more than substantially followed the earlier ones of *York Company v. Central Railroad,* 3 Wallace, 107, and *Railroad Company v. Lockwood,* 17 Id. 357.

The present constitution of this state was framed, submitted, and adopted, in the year 1875. Section 4 of article 11 of the constitution provides that "the liability of railroad corporations as common carriers shall never be limited." This clause expresses the supreme law of the state. If we can divine its meaning, then, as to us, the question is settled.

In following that general rule of construction, to consider the old law, and the mischief, in order to arrive at the meaning of a proposed remedy, we here take the old law as construed by the supreme court of the United States in the above case; and I think the mischief may be assumed to have been the facility with which common carriers were enabled either by deception or downright coercion to induce shippers to waive their rights under the law and enter into special contracts of shipment.

And while I concede as a general proposition that the true office of a state constitution is mainly to limit the powers of the legislature, and not to limit the effect of the contracts between parties, yet nearly all, and ours especially, contain departures from this rule. There may have been

instances of legislative limitation of the liability of railroad corporations, as common carriers, in some of the states of the Union or in Great Britain.   My other engagements have not allowed me to make an exhaustive examination of the question; but I am aware of none, and am quite sure that if even some such existed, the mischief resulting was not appreciated in this state sufficiently to have originated the constitutional provision under consideration.   So I conclude that the object and intent of the convention in proposing and of electors in adopting this provision of the constitution here referred to, was to put it out of the power of railroads, as common carriers, to limit their liability as such, by special agreements with shippers; and thus remove from their officers and agents all temptation to effect such exemption from liability, and the loss and damage to property which might of necessity follow the release of their responsibility and that of their agents therefor. (See *A. & N. R. R. v. Washburn,* 5 Neb. 117, a case which arose under the old constitution, but heard in this court under the new.)

Counsel for plaintiff in error complains of the second instruction given by the court to the jury on the trial. Numbers one and two are as follows:

"I. The jury are instructed that the defendant is a common carrier as to all property within the scope of its chartered powers; and it cannot by special agreement divest itself of such character; and therefore it is liable for the negligence of its servants.

"II. The jury are instructed that the contract in writing declares that it is, in consideration of a special rate, and if the jury believe from the evidence that the stock was not shipped on a special rate, but that plaintiffs paid the full regular rates for such service, then the special reservations, exceptions, or limitations, sought to be availed of by defendant, are without consideration, and the plaintiffs are not bound by the same where they restrict or limit the liability of defendant as a common carrier."

. Instruction number one falling within the meaning of the constitutional power as above construed, is approved. Number two, in my opinion, goes too far in favor of the plaintiff in error, as it seems to imply that, had the property been shipped on a special rate, below the regular rate, the plaintiff in error could have availed itself of the special contract to avoid its liability as a common carrier, which, as I understand the effect of the constitutional provision, it could not do.   No exception having been taken to the giving or the refusal to give other instructions, they will not be further considered.

As to the sixth clause of the shipping contract, set forth herein, and specially invoked by the plaintiff in error, if it were conceded that that clause was binding upon the defendants in error, there is an entire want of evidence to bring the case within its provisions.   Kansas City was the place of destination of the property within its meaning.   The shipper agreed as a condition precedent to his right to recover damages for any loss or injury to stock, to give notice in writing of his claim therefor to some officer of the party of the first part or its nearest station agent before said stock should be removed from its place of destination above mentioned, or from the place of delivery of the same to the party of the second part, and before such stock is mingled with other stock; and there is an entire lack of evidence, as shown by the bill of exceptions, of the removal of the stock from Kansas City, or of its having been mingled with other stock.

As to the special findings of fact, the second interrogatory ought not to have been given to the jury, for the reason that there was no evidence before them from which they could answer it.   Had there been such evidence, I agree with counsel that it would have been error on the part of the trial court to refuse to send the jury back at the request of the defendant for the purpose of answering that interrogatory.   These interrogatories were submitted

at the request of the defendants — a request which should have been refused as to the second interrogatory; therefore, the refusal of the court to send the jury back for the purpose of answering it, was error without prejudice to the plaintiff in error.

As to the evidence of the number of hogs shipped by the plaintiffs, and received from them by the defendant in its car, and the number delivered by it to the consignee of the plaintiffs at Kansas City, the evidence of the number shipped was before the jury, and tended to prove that there were sixty-nine hogs shipped; and while it must be admitted that had the evidence in regard to the number delivered by the defendant to the consignee of the plaintiffs at Kansas City, been objected to by the defendant when offered on the trial, it would have been rejected; yet, as it was not objected to, and as it tended to prove that but fifty-four of the said sixty-nine hogs were delivered to the consignee of the plaintiffs, and was apparently considered by the jury in making up their verdict, its competency will not be here considered.

The judgment of the district court is therefore affirmed.

JUDGMENT AFFIRMED.

THE other Judges concur.