St. Joseph & G. I. R. Co. v. Palmer.

ST. JOSEPH & GRAND ISLAND RAILROAD COMPANY V.
DE WITT W. PALMER.

FILED NOVEMBER 22, 1893.   No. 4644.

1. **Carriers**: INTERSTATE SHIPMENTS: JURISDICTION OF STATE COURTS. The state courts have not lost their jurisdiction of the subject-matter of actions against carriers because of interstate shipments by reason of the fact that congress has legislated upon the subject.

2. **Railroad Companies**: COMMON CARRIERS: CONTRACTS TO LIMIT LIABILITY. A railroad company, in the carriage of goods, is subject to the liability of a common carrier, and must answer for all losses not occasioned by the act of God or the public enemy, and cannot in this state by special contract limit or relieve itself from this liability.

3. ———: ———: ———: INTERSTATE SHIPMENTS. The fact that the contract was for the carriage of goods from a point in this state to a point in another state does not change the rule.

ERROR from the district court of Adams county. Tried below before GASLIN, J.

The facts are stated in the opinion.

*J. M. Thurston, W. R. Kelly,* and *E. P. Smith,* for plaintiff in error:

The bill of lading was the written contract of the parties. Parol evidence to prove a prior verbal agreement contradicting its provisions was inadmissible. (*Delaney v. Linder,* 22 Neb., 280; *Goss v. Lord Nugent,* 5 Barn. & A. [Eng.], 64*; *McNish v. Reynolds,* 95 Pa. St., 483; *Clarke v. Omaha & S. W. R. Co.,* 5 Neb., 322; *Hamilton v. Thrall,* 7 Neb., 210; *Dodge v. Kiene,* 28 Neb., 216.)

The court erred in submitting to the jury the question of the existence of any other contract for the shipment of the goods than that shown by the written bill of lad-

ing. (*Taylor v. Fox*, 16 Mo. App., 527; *Mulligan v. Illinois C. R. Co.*, 36 Ia., 181; *St. Louis, K. C. & N. R. Co. v. Cleary*, 77 Mo., 634; 2 Rorer, Railroads, p. 1319; 3 Wood, Railways, p. 1578, note; Hutchinson, Carriers, pp. 240, 241; *Cincinnati, H. & D. & D. & M. R. Co. v. Pontius*, 19 O. St., 222; *Hopkins v. St. Louis & S. F. R. Co.*, 29 Kan., 388; *Bank of Kentucky v. Adams Express Co.*, 93 U. S., 175; *Norwich Co. v. Wright*, 13 Wall. [U. S.], 113; *Squire v. New York C. R. Co.*, 98 Mass., 239; *Grace v. Adams*, 100 Mass., 505; *Steers v. Liverpool, N. Y. & P. Steamship Co.*, 57 N. Y., 1; *Long v. New York C. R. Co.*, 50 N. Y., 77; *Kirkland v. Dinsmore*, 62 N. Y., 171; *Belger v. Dinsmore*, 51 N. Y., 166; *McMillan v. Michigan S. & N. I. R. R. Co.*, 16 Mich., 79.)

The instructions proceed upon the theory that the constitution prohibits a railroad company in this state from limiting its liability to its own line. There was no common law duty in a common carrier to contract to carry beyond its own line. It had the power at common law to make a contract by which it was not to be held liable beyond its own line. The contract alone fixed the measure of its duty beyond its own line. The constitution does not create any new burden not existing in the common law. At common law and in this country a carrier is not a common carrier beyond its own line or chartered line of transportation. Any engagement beyond this must be measured only by the contract it may make in relation thereto. A railroad company may limit its liability as a common carrier to the line of its own road by express contract. (*Detroit & M. R. Co. v. Farmers & Millers Bank of Milwaukee*, 20 Wis., 130; *Mulligan v. Illinois C. R. Co.*, 36 Ia., 181; *Jones v. Cincinnati S. & M. R. Co.*, 45 Am. & Eng. R. Cas. [Ala.], 321; *Piedmont Manufacturing Co. v. Columbia & G. R. Co.*, 19 S. Car., 353; 2 Wood, Railways, p. 1572, and note; *Ortt v. Minneapolis & St. L. R. Co.*, 31 N. W. Rep. [Minn.], 519; *Hunter v. Southern P. R. Co.*,

13 S. W. Rep. [Tex.], 190; *Harris v. Grand Trunk R. Co.*, 5 Atl. Rep. [R. I.], 305, and note.)

State interference with the regulation of commerce, interstate in its character, cannot be sustained or upheld. (*Hart v. Pennsylvania R. Co.*, 112 U. S., 331; *Wabash, St. L. & P. R. Co. v. Illinois*, 118 U. S., 557; *Robbins v. Shelby County Taxing District*, 120 U. S., 492; *Leloup v. Port of Mobile*, 127 U. S., 640; *Bowman v. Chicago & N. W. R. Co.*, 125 U. S., 465.)

The court erred in refusing to mark the instruction for special findings requested by defendant either "given" or "refused" before submitting the same to the jury. (Secs. 54, 56, ch. 19, Comp. Stats.; *Tagg v. Miller*, 10 Neb., 443; *Fry v. Tilton*, 11 Neb., 456.)

It was error for the court to receive the general verdict, for the reason that the jury was unable to agree upon the questions submitted for special findings. (Sec. 293, Code; *Doom v. Walker*, 15 Neb., 339.)

*John M. Ragan, contra:*

The bill of lading was not the contract entered into for the shipment of the goods. The contract under which the parties acted was verbal. The rule forbidding the admission of parol evidence to contradict or vary the terms of a written agreement does not apply. The evidence of the parol contract was competent. (*Baker v. Michigan S. & N. I. R. Co.*, 42 Ill., 73; *Mobile & M. R. Co. v. Jurey*, 16 Am. & Eng. R. Cas. [U. S.], 132; *Pereira v. Central P. R. Co.*, 66 Cal., 92; *Bostwick v. Baltimore & O. R. Co.*, 45 N. Y., 712; *Strohn v. Detroit & M. R. Co.*, 21 Wis., 554; *Missouri P. R. Co. v. Beeson*, 30 Kan., 298.)

The law of the state in which the contract is made for the transportation of goods must control as to its nature, interpretation, and effect. (*Michigan C. R. Co. v. Boyd*, 91 Ill., 268.)

The company having contracted to carry the goods to
34

Grant's Pass, Oregon, and having accepted part of the freight, knowing what the car contained, could not limit its liability to its own line. (*Chicago & N. W. R. Co. v. Monfort*, 60 Ill., 175; *Wilde v. Merchants Dispatch Transportation Co.*, 47 Ia., 247; *Atchison & N. R. Co. v. Washburn*, 5 Neb., 117; *Missouri P. R. Co. v. Vandeventer*, 26 Neb., 222; sec. 4, art. 11, Constitution; sec. 111, ch. 16, Comp. Stats., 1887; *Jones v. Voorhees*, 10 O., 145; *Baltimore & O. R. Co. v. Campbell*, 36 O. St., 647; *Hale v. New Jersey Steam Navigation Co.*, 15 Conn., 539; *Derwort v. Loomer*, 21 Conn., 245; *Western Transportation Co. v. Newhall*, 24 Ill., 466; *Union P. R. Co. v. Marston*, 30 Neb., 241; *Illinois C. R. Co. v. Frankenberg*, 54 Ill., 88; *Adams Express Co. v. Steltaners*, 61 Ill., 184; *Ogdensburg & L. C. R. Co. v. Pratt*, 89 U. S., 123; *New York C. R. Co. v. Lockwood*, 84 U. S., 357; *Chicago, R. I. & P. R. Co. v. Conklin*, 32 Kan., 55; *Hannibal & St. J. R. Co. v. Swift*, 12 Wall. [U. S.], 262.)

A judgment rendered on a special verdict will not be reversed for a failure to determine one or more of the issues, if the uncontradicted evidence proves that issue in favor of the prevailing party. (*Williams v. Porter*, 41 Wis., 423.)

The special questions submitted must be so material that answers to them would establish the case or the defense, and judgment will not be reversed for the failure of the jury to answer questions where, if answered, the answers could not have affected the result. (*McDermott v. Higby*, 23 Cal., 489; *Sage v. Haines*, 76 Ia., 581; *Louisville & N. R. Co. v. Brice*, 1 S. W. Rep. [Ky], 483; *Osborne v. Pennsylvania R. Co.*, 11 S. W. Rep. [Ky.], 207; *Seekell v. Norman*, 43 N. W. Rep. [Ia.], 190; *Schneider v. Chicago, B. & N. R. Co.*, 43 N. W. Rep. [Minn.], 783; *Dively v. City of Cedar Falls*, 27 Ia., 227; *Greenleaf v. Illinois C. R. Co.*, 29 Ia., 14; *Chicago & N. W. R. Co. v. Dunleavy*, 129 Ill., 132.)

IRVINE, C.

The plaintiff in error was a railroad company operating a line of railroad between St. Joseph, Missouri, and Grand Island, Nebraska, and passing through the city of Hastings, Nebraska. In December, 1889, certain goods were loaded into a car at Hastings for shipment to Grant's Pass, Oregon. These goods consisted of furniture, wearing apparel, and household goods belonging partly to one Pardee and partly to one Hart, and of a stock of drugs and drug store fixtures belonging to the defendant in error, Palmer. The goods were carried to Grand Island by the plaintiff in error, and there turned over to the Union Pacific Railway Company, on the line of whose road the car was wrecked and no part of the goods was ever delivered at Grant's Pass. Pardee and Hart assigned their claim to Palmer, who brought this suit in the district court of Adams county to recover damages for the loss of the goods.

The petition of the plaintiff below, in addition to the foregoing facts, which are undisputed, pleads, among other things, that Palmer, Pardee, and Hart entered into a verbal contract with the defendant to transport said goods and property to Grant's Pass and there safely deliver them in ten days in consideration of the sum of $200, and that after the goods were loaded into the car a paper was presented to Pardee for signature, and he signed it, believing it to be a receipt and in ignorance of certain clauses therein contained; that after the goods were turned over to the railroad company for shipment, and the freight of $200 paid, the railroad company's agent stated to the owners that the $200 might not be enough to pay the freight and extorted from the owners a promise that in case the freight should exceed $200, they would pay the excess; that the paper referred to was not the contract of shipment, but that the contract was as first stated, and that the contents and limitations of the paper were fraudulently concealed from the

owners of the goods.  The paper referred to was in fact a
bill of lading, and the clauses in regard to which fraud was
alleged were two: The first was that the railroad company
assumed no liability beyond the end of its own line; that
is, at Grand Island, Nebraska.  The other is as follows:
"One car emigrant outfit O. R. Rel'd val. of $5 per cwt.
in case of total loss.  S. L. & C."

The answer, so far as it is material, may be analyzed as
follows: First—That the railroad was engaged in the
business of interstate commerce, and that this was an inter-
state shipment and not within the jurisdiction of the state
courts.  Second—That the bill of lading constituted the
contract between the parties; that the first provision quoted
exempted the defendant beyond the end of its own line,
and that there was no fraud or concealment.  Further, that
the somewhat cabalistic letters and words quoted from the
bill of lading meant and were understood to mean owner's
risk released to the value of $5 per cwt. in case of total
loss, and that the shippers were to load and count the goods.
Third—That the contract between the parties contemplated
merely the shipment of an emigrant outfit, which was under-
stood to mean household goods alone, and that the stock
of drugs was fraudulently loaded into the car; the estab-
lished rate on a car containing drugs being very much
greater than the established rate on an emigrant outfit.
Fourth—That under the interstate commerce law false
representations as to the contents of the package, with the
consent and connivance of the carrier or its agent, are con-
stituted a misdemeanor and bar the plaintiff from relief.

The evidence upon the part of the plaintiff tends to
show that Pardee and Hart went to the agent of the com-
pany at Hastings, stating to him that they wished to ship
their household goods and stock of drugs, and asked him
for the rate to Grant's Pass upon the car load; that the
agent informed them that the rate would be $200, and
that there would be nothing to pay at the other end of the

line; that thereupon the goods were loaded upon a car furnished by the railroad company for that purpose; that after the loading was complete, Pardee and Palmer went to the agent for the bill of lading; that the agent then told them that inasmuch as the drugs had been loaded upon the car, he was not sure that $200 would pay the freight, but that he would mark upon the bill of lading a receipt for the $200, to apply on the freight, and if there was more to pay it must be paid at the other end; that they consented to this, because there was no other course left open to them; that the bill of lading was then handed to them, and Pardee signed it, none of the owners reading its conditions or having his attention called thereto.

Upon the part of the railroad company the testimony tends to show that at the first interview nothing was said about the stock of drugs, but that when Pardee came for the bill of lading the agent told him that he would not give him a clear bill of lading for he had reason to believe that "there was other stuff in the car besides household goods," but would accept $200, to be applied, the owners to pay the difference at the other end; that Palmer then handed him $200, and Pardee signed the bill of lading in duplicate.

The case was submitted to the jury under long instructions, the general effect of which was to submit the question as to whether the oral agreement pleaded or the bill of lading constituted the contract between the parties; further, to instruct the jury that under the laws of this state no limitations upon the liability of a common carrier could be imposed except upon proof that such limitations had been called to the attention of the shipper and by him expressly assented to, and submitting to the jury whether or not attention had been called to the limitations and assent obtained. There was a verdict for the plaintiff in the sum of $5,461.53.

1. The question of jurisdiction was first raised by de-

murrer to the petition and then by answer. The theory of the railroad company in this regard seems to be that the shipment being from one state to another, it became subject solely to the laws of the United States. If that were so, it would not oust the court of jurisdiction. It would only determine upon what principles of law the rights of the parties would depend. The record shows that an attempt was made to remove the case to the federal court; that the court refused to order the removal. Nevertheless, it would appear that an order of removal must have been obtained from some source, for there is in the record an order of the federal court remanding the case to the district court of Adams county. These proceedings are a part of the law of the case and conclusively determine the question of jurisdiction in favor of the plaintiff.

2. The questions of law in regard to the transaction are discussed in the briefs under a number of heads relating to objections to the evidence and to the instructions of the court. To state each in its order would consume much space, and a detailed consideration is unnecessary, for the reason that all these exceptions and assignments of error relate to a very few main questions. Great stress is laid upon the point that the bill of lading must be treated as the conclusive evidence of the contract between the parties, and that parol evidence was not admissible to show a prior verbal contract contrary to the terms of the bill of lading. In this connection it is also urged very strenuously that the court erred in submitting the question raised by this evidence to the jury. Further, it is urged that the instructions of the court are conflicting; and still further, that the limitations imposed by the bill of lading upon the carrier's liability are, upon principles of common law, valid obligations, and that they must be enforced in the absence of actual misrepresentations or concealment, which it is contended the evidence does not establish. Numerous authorities are cited upon both sides upon these points. A single

consideration disposes of all of these questions. Under the law of Nebraska, whatever the law may be elsewhere, it is beyond the power of a common carrier, by such provisions as appear in the bill of lading, assuming it to be the contract of the parties, to so limit its liability.

In *Atchison & N. R. Co. v. Washburn*, 5 Neb., 117, it is said: "The common law fixed the degree of care and diligence due from railroad companies as common carriers, and a failure to exercise this care and diligence is negligence, without any legal distinction as being gross or ordinary; and the better rule of law, sustained by the weight of authority, is that 'it is against the policy of the law to allow stipulations which will relieve the company from the exercise of that care and diligence, or which, in other words, will excuse them for negligence in the performance of that duty.'" This case arose before the constitution of 1875 went into force. By article 11, section 4, of that constitution, it is provided that "the liability of railroad corporations as common carriers shall never be limited." While the writer might, if the question were a new one, construe this provision as simply a restriction upon the legislature against the limitation of carriers' liabilities by law, and not as preventing such limitation by special contract, the question is no longer an open one and has otherwise been determined. In *Missouri P. R. Co. v. Vandeventer*, 26 Neb., 222, by contract the railroad company sought to relieve itself from liability for injury to live stock unless notice in writing were given before the removal of the stock from its place of delivery. This provision of the constitution was there considered and discussed. The court, speaking through Judge COBB, says: "So I conclude that the object and intent of the convention in proposing, and of electors in adopting, this provision of the constitution here referred to was to put it out of the power of railroads, as common carriers, to limit their liability as such by special agreements with shippers, and thus remove

from their officers and agents all temptation to effect such exemption from liability, and the loss and damage to property which might of necessity follow the release of their responsibility and that of their agents therefor. (See *Atchison & N. R. Co. v. Washburn*, 5 Neb., 117, a case which arose under the old constitution, but heard in this court under the new.)" In addition to this constitutional provision, section 111 of chapter 16, Compiled Statutes, provides that "any railroad company receiving freight for transportation shall be entitled to the same rights and be subject to the same liabilities as common carriers." This is a portion of the general incorporation act under which the plaintiff in error derives its existence as a corporation. Compiled Statutes, chapter 72, article 1, section 5, provides: "No notice, either express or implied, shall be held to limit the liabilities of any railroad company as common carriers, unless they shall make it appear that such limitation was actually brought to the knowledge of the opposite party and assented to by him, or them, in express terms, before such limitation shall take effect." This section was discussed by the court in *Union P. R. Co. v. Marston*, 30 Neb., 241, and held to apply to just such a case as this, where the limitation was contained in a bill of lading which the shipper alleged was given after the making of an oral contract for shipment. Irrespective, then, of the question as to whether there was an oral contract, or whether such oral contract or the bill of lading constituted the final arrangement between the parties, the law of this state is settled that a common carrier cannot, even by the terms of an express contract, relieve itself of its common law liability.

It is said that at common law the common carrier is not liable for loss, in the absence of special contract, beyond the point at which it delivered the goods to a connecting carrier. To this it should be added that the contract of the shipper was with the carrier first receiving the goods, and

if such carrier undertook to deliver' the goods at their destination, even though it contemplated doing so through intermediate carriers, it assumed a liability of such character for every part of the route. Many cases hold that receiving goods marked for a point beyond the end of the receiving carrier's route is evidence of a contract to deliver them as marked. In this case the bill of lading was executed in duplicate. In one of the copies the destination was left blank; in the other the language was: " Received of Palmer & Pardee the following described package, in apparent good order, marked and consigned as noted below, contents and value unknown, to be transported to Grant's Pass, Or., and delivered at the railroad depot at that point." Both copies in writing show that the goods were consigned to Pardee at Grant's Pass, Oregon. The negotiations as to the freight were, according to the uncontradicted testimony, with a view to prepayment all the way through. Hastings was only twenty-four miles from Grand Island, where the car was delivered to the Union Pacific; and the $200 received by the railroad company, if not intended as a full prepayment of the freight to Oregon, was certainly intended to apply on the freight throughout the whole distance. There is no possible view of the evidence from which it could be inferred that the railroad company had only contracted to deliver the goods to the next carrier.

3. The plaintiff in error seeks to avoid the effect of these constitutional and statutory enactments and judicial construction by pleading and arguing the effect of the act of congress known as the " interstate commerce law " and amendments thereto. The particular provision relied upon is from the act of 1889, as follows: ."Any person, or any officer or agent of any corporation or company, who shall deliver property for transportation to any common carrier subject to the provisions of this act, or for whom, as consignor or consignee, any such carrier shall transport property, who shall knowingly and willfully, by false billing, false classi-

St. Joseph & G. I. R. Co. v. Palmer.

fication, false weighing, false representations of the contents
of the package, or false report of weight, or by any other
device or means, whether with or without the consent or
connivance of the carrier, its agent or servant, obtain trans-
portation for such property at less than the regular rates
then established and in force on the line of transportation,
shall be deemed guilty of fraud, which is hereby declared
to be a misdemeanor, and shall, upon conviction thereof,
in any court of the United States of competent jurisdiction
within the district within which such offense was committed,
be subject, for each offense, to a fine of not exceeding $5,000,
or imprisonment in the penitentiary for a term not exceed-
ing two years, or both, in the discretion of the court."

Conceding that the construction of such acts into misde-
meanors should render the contract contrary to public
policy to such an extent as to deprive the shipper of his
remedy against the carrier, the evidence wholly fails to
make out a case within the section quoted. Whatever false
billing there may have been was by the company itself, as
all the evidence shows that the agent knew before the car
was moved after loading that it contained articles other
than household goods. Under the most favorable con-
struction of the evidence on behalf of the railroad com-
pany, if there was any false representation as to the
contents of the "package," its true contents were known
before the railroad company took charge of the car, and an
agreement was made for the payment of any additional
freight by reason of the introduction of drugs into the car.
We cannot see, therefore, how this section, conceding it to
have the effect claimed for it by plaintiff in error, could
affect the right of recovery. To give it such effect would
be to declare that the section quoted absolutely protects a
railroad company from liability in any case where the
shipper uses general terms in describing the goods to the
carrier or agent, and the agent paraphrases such language
into a technical phrase and such phrase does not correctly

describe the goods, or where the carrier's agent, of his own volition, makes false statements of the character of the shipment. The section referred to was chiefly designed as a restriction upon the carrier. Its whole aim was to prevent false billing or false representations in order to conceal discriminations in favor of particular shippers. It was not intended, and should not be construed, as a means of relieving a carrier from liability because its own agents have committed an error.

But it is argued that upon general grounds the whole subject-matter of interstate transportation was by the constitution placed within the power of congress, and that congress, having enacted the interstate commerce act, assumed such jurisdiction and thereby nullified existing state laws; that not only the acts of congress must be treated upon these subjects as the supreme law of the land, but that the decisions of the federal courts must be accepted as the final statements of the law, prevailing against state statutes and state decisions. Without discussing the question as to whether the federal decisions are opposed to the constitutional and statutory provisions of this state referred to, it is sufficient to say that we cannot accept the theory of the railroad company as above outlined. It is admitted in the pleadings that the company is a corporation organized under the laws of the state of Nebraska. The time of its organization does not appear, but the statutory provisions date from the very earliest period of the state's history. One statute quoted above is a portion of the general incorporation act relating to railroads, the act under which this company derives its right to exist. To say that an act of congress, especially one not in express terms contrary to these provisions, shall be given the effect of nullifying them would be to say that this state must cease to exercise its sovereign power of creating corporations for railroad purposes, else it must content itself with creating such corporations absolutely untrammeled by con-

St. Joseph & G. I. R. Co. v. Palmer.

ditions, or permit them to exist subject only to such conditions as the congress of the United States may see fit to impose. While this state forms a constituent part of the Union under its present constitution, this court should never yield its consent to such a doctrine. If such be the law, it must be declared by another tribunal; and in case it should be so declared, the exercise by the state of its sovereign power of creating such corporations should, from every motive of self-preservation, cease.

4. In addition to the general verdict rendered by the jury there was an attempt to have certain special findings returned. One of the errors assigned is the refusal of the court to mark upon the margin of the submission of those findings the word "given." If the submission of these findings amounted to an instruction the objection would be purely technical, and the refusal of the court to use the word "given" could not operate to the prejudice of the plaintiff in error. Instead of marking the submission given, the court made a note as follows: "As I have said in the attached submission, I submit these special findings for you to pass upon; and, in the opinion of this court, it would be the grossest kind of error to attempt to control your discretion in passing on these special findings." There also appears to have been indorsed upon the questions submitted a quotation of that portion of the statutes whereby it is permitted to the jury in its discretion to return a general or special verdict. Of the special questions submitted the first related to the value of the goods at Hastings and was answered. The second related to the value of the goods at Grant's Pass, Oregon, at the time when they should have been received there. In answer to this the jury stated: "We do not know." The other questions related to the freight rates under different circumstances. All these questions were answered: "We do not know." By the instructions the jury was told that if it should find for the plaintiff, the verdict should be for the market value

of the goods at Grant's Pass at the time they should have been there delivered, together with interest. The second question submitted was material to the case. The others were entirely immaterial, and the discharge of the jury without answering them was in no way prejudicial. It is urged, however, that when the jury answered that they did not know the market value of the goods at Grant's Pass, it, in effect, stated that it was unable to fix the measure of damages and that the general verdict could not, therefore, have been founded on the evidence and in obedience to the instructions. But under the evidence given as to the value of the goods at Grant's Pass, no verdict less than that returned could be sustained. There is evidence tending to show that the value of the goods at Hastings was less than the value marked upon an inventory offered in evidence, and one witness testified that the goods were worth no more at San Francisco than at Hastings, but there is nothing to show that he even had any knowledge of the value at San Francisco. The only competent evidence of the value of the goods at Grant's Pass, Oregon, fixes it at more that $7,000; so that the verdict rendered could not have been affected by any findings based upon the evidence in answer to the special question submitted.

Some of the instructions do not state the law correctly. Some of them are apparently conflicting, but in any view of the evidence, for the reasons already stated, no verdict different in character or less in amount could be sustained. The judgment is therefore

AFFIRMED.

RAGAN, C., took no part in the consideration or decision of this case.