NYE-SCHNEIDER-FOWLER COMPANY, APPELLEE, v. CHICAGO & NORTHWESTERN RAILWAY COMPANY, APPELLANT.

FILED SEPTEMBER 27, 1920.   No. 21056.

1. Carriers: TRANSPORTATION OF LIVE STOCK: LIABILITY.  A railroad company is liable for damage to live stock carried by it, except for such damage as results from the act of God, the public enemy, the fault of the owner, or the natural propensities of the animals.

2. ———: INJURIES TO LIVE STOCK: PRESUMPTION.  When live stock, unaccompanied by a caretaker, is received by a railroad company in good condition and is delivered later to the consignee in a damaged condition, a *prima facie* case is made against the railroad company by reason of a presumption that the damage resulted from some cause other than one which would exempt the company from liability.

3. ———: ———: ———.  Such presumption is not evidence, and expires when sufficient evidence is introduced of the facts out of which the damage grew to support a finding that the damage was from a cause for which the company would not be liable.

4. Evidence: RECORDS: COMPETENCY.  A book record, kept by the stock yards company, of dead and crippled animals received in shipment, kept in regular course of business and as a record upon which the transactions with the packing companies purchasing hogs is based, is not rendered incompetent, as not being a book of original entry, from the fact that the entries are made by a clerk from data collected by various other employees.

5. Carriers: LIABILITY OF INITIAL CARRIER.  When a railroad company makes a contract to deliver live stock at a point beyond its own line, it becomes liable for the default of the connecting and terminal carriers under section 6058, Rev. St. 1913, and cannot, in the event of such a contract, limit its liability as a carrier to its own line.

6. **Constitutional Law: Statute Fixing Liability of Carriers.** Though such statute fixes a liability on the initial carrier for the default of another carrier, and gives no express right of reimbursement to the initial carrier, the initial carrier has the right of reimbursement from the connecting carrier under the general principle of subrogation, and the statute cannot be said, on that objection, to be unconstitutional, as depriving the initial carrier of its property without due process of law; nor is the statute unconstitutional as denying such carrier the equal protection of the law.

7. **Trial: Instructions: Burden of Proof.** An instruction that "the burden of proof is upon any one * *. * to establish * * * such several allegations as he asserts are material to such one's success" is improper and misleading, but *held* not reversible error in this case, since other instructions definitely cover the subject.

8. ———: ———: **Credibility of Witnesses.** In passing on the credibility of witnesses, the jury are not required to lay aside their general knowledge which comes from the common experience of mankind, and an instruction to that effect is not improper.

9. **Carriers: Attorney's Fees.** Section 6063, Rev. St. 1913, making provision for attorney's fees to plaintiff's attorneys, upon claims against a railroad, *held* to allow recovery in the nature of reimbursement of costs, and not unconstitutional as providing a penalty in favor of an individual.

10. **Costs: Attorney's Fees.** An attorney's fee to be reasonable, under such a statute, should be based upon a consideration of the value of the attorney's service to his client and the amount of time and labor expended by him, but should not bear an unfair proportion to the amount of the judgment recovered.

Appeal from the district court for Dodge county: Frederick W. Button, Judge. *Affirmed on condition.*

*Wymer Dressler* and *C. H. Gorman,* for appellant.

*Courtright, Sidner, Lee & Jones,* contra.

Flansburg, J.

Plaintiff is a stock shipper, and brings this action to recover for damages to hogs during shipment to South Omaha over defendant's railroad. Various shipments of hogs are involved. The shipments occurred during a period of two years, 1916 and 1917, and the claims are represented by 71

separate causes of action. The jury returned a general verdict on all causes of action for $802.27, and defendant railroad company appeals.

Plaintiff introduced evidence to show that the hogs were delivered to defendant in good condition, and that when received by the consignee at South Omaha 59 hogs were dead and a number crippled. The shipments were made without a caretaker.

Plaintiff relies, for a *prima facie* case, upon the presumption that all damage to the hogs during shipment was caused by the negligence of the defendant railroad.

Testimony was introduced by defendant to show the damage was from disease and natural causes, for which it would not be liable, and contends that in those instances, where such testimony was introduced, the legal presumption that the defendant had been negligent and caused the damage would expire; that such presumption is not and does not take the place of evidence, and that the court should have withdrawn those items from the jury, since in those instances there was no issue of fact to be submitted.

Where it appears that live stock, unaccompanied by a caretaker, is received by a railroad company in good condition and delivered later to the consignee in a damaged condition, a *prima facie* case is made against the railroad company, and the burden is upon it to show that such damage resulted from some cause which would exempt it from liability. Information as to the cause of damage during shipment is peculiarly within the knowledge of the railroad company, and the company is therefore required, as a matter of expediency, to produce the proof of the cause of damage, and to show whether or not the cause is one for which it can or cannot be held responsible. *Church v. Chicago, B. & Q. R. Co.*, 81 Neb. 615; *Chicago, B. & Q. R. Co. v. Slattery*, 76 Neb. 721; 10 C. J. 379, sec. 581. A railroad company, under our decisions, is an insurer of live stock carried by it, except for such damage as results from the act of God, the public enemy, the fault of the owner, or the natural propensities of the animals. In the absence of any evidence, it is presumed that the damage was

not the result of any one of those causes. Such presumption, however, is not evidence, and is destroyed when actual evidence is introduced of the facts out of which the damage occurred. When evidence of such facts appears and is sufficient to sustain a finding, the presumption expires.

Doctor Everett, a veterinarian, testified, in behalf of the defendant, that he inspected the hogs at destination, and that some of the hogs had been killed by smothering, caused by their piling on one another. Other testimony was to the effect that hogs might pile on one another to keep warm in cold weather, or in an endeavor to get fresh air in hot weather, but there was also testimony showing that hogs could be made to pile by severe and unusual bumping of the cars. Other veterinarians testified that death from smothering could not be determined from casual inspection. Whether these dead hogs were smothered and, if so, the actual cause of smothering were questions, under the evidence introduced, open to reasonable dispute, and were for the jury. Doctor Everett further testified that certain of the hogs had died from cholera, but his opinion on that matter was disputed by the testimony of other veterinarians who said that cholera could not be detected by such a casual examination as Doctor Everett made. He further testified that certain of the hogs had died from congestion of the lungs, as determined from a *post mortem* examination. His testimony on that point stands alone, and, since there is evidence to show without controversy that those particular hogs died from natural causes, the claims covering them should have been withdrawn from the jury. These are items 6, 48, 58, and 95, upon which claim was made of $163.86.

Doctor Everett again testified that certain of the hogs, which seemed to be crippled, had a disease known as arthritis, and humped up and walked on their toes in a manner peculiar to that disease. There is some dispute in the testimony as to whether arthritis is a rheumatic or tubercular disease, but Doctor Everett's testimony that

the crippling of the hogs was due to this disease is not controverted.     The presumption, then, that the hogs were crippled as a result of some act of the defendant would no longer obtain, and the claims upon those hogs should also have been withdrawn.   They were items 16, 20, 29, 39, 47, 49, 51, 79, and 85, upon which a total claim of $41.40 was made.  It also appears that one hog, claimed to be crippled (item 19), was suffering from a disease and partial paralysis, brought on by such disease.  The amount of claim on this item was $3.75.   Before the judgment in this case can be allowed to stand, a remittitur should be filed covering the amounts of these claims which should have been withdrawn.

The defendant contends that plaintiff's proof is based upon incompetent evidence.  The Union Stock Yards Company, into whose yards the hogs were delivered, keeps a record of the number and condition of the hogs when taken from the cars.   This book record was introduced in evidence by the plaintiff, over defendant's objection, to show that the hogs in question were received, some dead and some crippled.  The plaintiff's case must stand or fall upon the competency of this proof.

A number of employees of the stock yards company get data for this record.   One employee is known as a "car checker."  He is supplied with what is called a "chute book."  He enters in this book the number of the car opposite each chute, and then turns the book over to the yard-master, who goes into the chute and counts the animals unloaded from the car, and enters the result of his count in this book.  He also enters the name of the shipper and consignee and point of origin of shipment, which information he hears read by another from the waybills of the railroad company.

Another employee, known as the "cripple checker," carries a book called the "cripple record," and counts and enters in this book the number of crippled animals in each car.

Another employee, known as the "dead hog checker," keeps what is called a "dead stock record."  He goes into

each car and counts and enters in this book the number
of dead animals found and records the number of the car.
The "stock yards record book" is the book which was in-
troduced in evidence, and it contains a complete record of
each individual shipment received. It contains the name
of the railroad, number of car, name of shipper and con-
signee, number of animals, and number of "cripples and
deads." The information as to the number of animals in
each car and the number of "cripples and deads" is taken by
the office clerk from the so-called "chute book," "cripple
record," and "dead stock record," just described. It is a
complete compilation made up immediately from the data
contained in these memoranda books, with other data, and
is the first complete and permanent record of the shipment,
based upon the data so collected. The preliminary books
mentioned seem to be in the nature of memoranda, gather-
ed for the purpose of making the stock yards record book.
These memoranda books are very numerous, since the stock
yards company receives several hundred cars of live stock
each day. There are a number of sets of employees who
keep the memoranda, and the books are not identified by
the party making them otherwise than by handwriting.
Although these books are kept by the company, it is an
enormous task to go through the various books to find the
record of each individual car in question, and then to learn
from the handwriting what employee made the record. As
the superintendent of the stock yards testified, it would
have been necessary in this case to have examined an ex-
press wagon load or two of these memoranda books in order
to sort out the items here involved. This "stock yards
record book" is kept in the regular course of business, and
is the record upon which the transactions with the packing
companies purchasing hogs are based. A number of em-
ployees, who made the original memoranda books and turn-
ed them in to be copied into the "stock yards record
book," testified as to the manner of getting the data, identi-
fied a number of these books and testified to their correct-
ness. The clerk testified that the stock yards record was
made by him, and that the entries were true and correct

entries of the information furnished him in the manner we have just described. Since this is a first complete record made directly from the data so collected and is kept in the regular course of business, it may be considered a book of original entry. It cannot be said to be incompetent, nor to be hearsay evidence, from the fact that it is made directly from other memoranda, even though that memoranda may have been collected by other employees. *Missouri Electric Light & Power Co. v. Carmody,* 72 Mo. App. 534; *Louisville & N. R. Co. v. Daniel,* 122 Ky. 256; *Mercantile Trust Co. v. Doe,* 26 Cal. App. 246; *Cudahy Packing Co. v. Chicago & N. W. R. Co.,* 201 S. W. (Mo. App.) 596; *Union Pacific Lodge v. Bankers Surety Co.,* 79 Neb. 801; 22 C. J. p. 874, sec. 1055, p. 887, sec. 1077.

The defendant further contends that the record of cripples, as contained in this book, is not evidence of actual crippling, since, so far as the record is concerned, every hog which does not walk with the herd, is marked a cripple, whether a cripple or whether too slow or too fat to go with the rest. Just what the term "cripple" means on the record is, however, put in controversy by the testimony of a stock yards employee, who says that it is his duty and the duty of other employees to gather all hogs which are in good condition, and too slow and too fat to walk, and to haul them by wagon and deliver them with the herd, and that only actual cripples are left in the pens, and therefore recorded in the book. There was, then, an issue of fact upon that question.

It is admitted by the pleadings that plaintiff's shipments were all made to the Standard Live Stock Commission Company at South Omaha. It appears from the evidence that the defendant, upon reaching South Omaha, turns its cars over to the Union Stock Yards Company, which handles the cars, pulls them into its unloading stations, and there itself conducts the unloading and delivery of the animals. The stock yards company acts as terminal carrier for these shipments so long as its duties as a carrier continue. The damage to hogs, complained of, is shown to have existed immediately after unloading and before there

was delivery or opportunity to deliver to the consignee, and there is therefore no proof that the obligation of the stock yards company as a carrier had at that time termi-. nated, and that its obligation as a bailee, for which the initial carrier could not be held liable, had commenced. See note, L. R. A. 1918B, 631 (*Adams Seed Co. v. Chicago, G. W. R. Co.*, 181 Ia. 1052).

In this connection, the court based certain instructions upon that portion of section 6058, Rev. St. 1913, which reads as follows: "Whenever two or more railroads are connected together, the company owning either of such roads receiving freight to be transported to any place on the line of either of the roads so connected shall be liable as common carriers for the delivery of such freight, to the consignee of the freight, in the same order in which such freight was shipped"—and the jury were told that, though the damage to the hogs might have been sustained during the time that the stock yards company handled them, still the defendant could be held liable for that damage as initial carrier.

The defendant contends that the statute is not operative in this case, since the bill of lading covering the shipments, in every instance, contained a provision that the "responsibility of this railway company shall cease upon delivery of said property to its connecting line," and that, by virtue of this limitation, the defendant railroad could not be held liable for the default of the stock yards company.

Defendant relies upon the holding in *Fremont, E. & M. V. R. Co. v. Waters*, 50 Neb. 592; *Fremont, E. & M. V. R. Co. v. New York, C. & St. L. R. Co.*, 66 Neb. 159; and *Whitnack v. Chicago, B. & Q. R. Co.*, 82 Neb. 464. Those cases are distinguishable from this, for in each of those cases the contract *of carriage* was over the line of the initial carrier only, and was a contract only to deliver to the connecting carrier. It may be further noted that the portion of the statute in question here was in none of those cases invoked or referred to.

In the case at bar the contract of carriage was to the Standard Live Stock Commission Company at South

Omaha, necessitating the employment of the Union Stock Yards terminal facilities to make delivery at the point of destination, designated in the contract of transportation. It is unnecessary to enter upon the question of whether or not a carrier can, in the face of this statute, limit its contract of carriage to its own line, when the completed transportation contemplated necessitates the employment of a connecting carrier, for that is not the contract in this case. It seems clear to us, however, that, where the railroad company does make a contract for through transportation, as was done here, it cannot, at the same time, limit its liability to loss or damage occurring on its own line, and relieve itself from the default of its connecting carrier, the obligation for whose default is expressly imposed by the statute. *Miller Grain & Elevator Co. v. Union P. R. Co.*, 138 Mo. 658; *Burtis v. Buffalo & S. L. R. Co.*, 24 N. Y. 269; *Chicago, R. I. & P. R. Co. v. Western Hay & Grain Co.*, 2 Neb. (Unof.) 784; *St. Joseph & G. I. R. Co. v. Palmer*, 38 Neb. 463; see note, 31 L. R. A. n. s. 52 and 53; *Atlantic C. L. R. Co. v. Riverside Mills*, 219 U. S. 186.

Defendant raises the question that this statute is unconstitutional, for the reason that it fixes a liability upon an initial carrier for the default of a connecting carrier, does not furnish to the initial carrier any express right of procuring reimbursement when the loss occurs on the line of the connecting carrier, and hence deprives the initial carrier of its property without due process of law, and denies to it the equal protection of the law, in violation of the Fourteenth amendment to the Constitution of the United States. For such loss, due to the fault of the connecting carrier, the initial carrier, it seems clear, would have the right of reimbursement under the general doctrine of subrogation, though the statute does not expressly so provide. *Texas & P. R. Co. v. Eastin & Knox*, 100 Tex. 556; 37 Cyc. 394.

The defendant complains of the court's instruction: "The burden of proof is upon any one in litigation to establish by a preponderance of the evidence, in maintaining his cause of action or defense, such several allegations as he

asserts are material to such one's success in the action, unless such allegations are admitted by the opposing side." Such an instruction is no aid to a jury, and, in fact, if standing alone and uninterpreted, might be positively misleading. In this case the court proceeded to give other instructions definitely placing the burden of proof, and we do not see that prejudice resulted from the giving of the instruction complained of, nor that in this case it constitutes reversible error.

It is further urged that the court erred in instructing the jury upon the credibility of witnesses by adding a statement that the jury should "consider all the facts shown to exist that will aid you in properly weighing the testimony of each witness. And, in this manner, appealing *to your own experience and knowledge of men and of the affairs of mankind,* and in your own best judgment, examine, measure and weigh the evidence of each witness, and then give to it such effect as you think it fairly and justly entitled to." The defendant contends that the court thus gave the jury to believe that they might take into consideration their own peculiar experience or observation regarding either the particular witness or the matters testified about, in addition to or irrespective of the evidence, and thus arrive at a verdict. A fair interpretation of the instruction, however, it seems to us, does no more than advise the jury that they are to consider the witnesses in the light of that knowledge which comes from the common experience of mankind, and not their personal knowledge of the character of any of the witnesses, nor of the matters upon which the witness is called to testify. Such general knowledge on the part of the jury and their own observations and experience they are not required to lay aside, when it comes to a matter of determining the credibility of the witnesses who appear before them. 38 Cyc. 1761.

The trial court allowed an attorney's fee of $600 to plaintiff's attorneys under section 6063, Rev. St. 1913. Defendant contends that this statute is unconstitutional, since it imposes a penalty upon the railroad in favor of an individual. This question is foreclosed by the holdings in

*Smith v. Chicago, St. P., M. & O. R. Co.,* 99 Neb. 719, and *Marsh & Marsh v. Chicago & N. W. R. Co.,* 103 Neb. 654. It is there decided that an allowance of attorney's fees is in the nature of a provision for costs, and does not amount to a penalty. A provision for costs is intended to furnish reasonable reimbursement to the litigant who is compelled to bring suit and incur expense, caused by the wrong of the losing party. The amount of these fees is left to the discretion of the court, the limitation of the statute being that the amount must be reasonable. So long as the fees are reasonable in amount and not exorbitant, the statute does not operate as a penalty, since it provides only reimbursement of necessary expenses. It was not intended by this statute that the railroad company should pay double damages. An attorney's fee to be reasonable must, under such a statute, not only be based upon a consideration of the value of the attorney's service to the plaintiff, and the amount of time and labor expended by him, but must bear some fair proportion to the amount of the judgment recovered. In this case plaintiff sued for some $3,000. A judgment for $802.27 was obtained, and, in order that the judgment may be allowed to stand, it is necessary that it be cut down by way of remittitur in the amount of $209.01. Though the plaintiff's attorneys have done a considerable amount of work in preparation for the trial of this case, still, under the circumstances disclosed by the record, we must hold that a $600 attorney's fee is more than can reasonably be allowed, and it is ordered that the attorney's fee for plaintiff's attorneys in the trial court be fixed at $200. An attorney's fee of $100 is allowed plaintiff's attorneys for services in this court.

It is further ordered that, should the plaintiff file a remittitur in the amount of $209.01, within 20 days from the entry hereof, the judgment of the trial court be affirmed; on the other hand, should such remittitur not be filed, that the case be reversed and remanded for further proceedings in accordance with this opinion.

AFFIRMED ON CONDITION.

ALDRICH, J., not sitting.